## BLYDENSTEIN et al. v. NEW YORK SECURITY & TRUST CO.

### (Circuit Court of Appeals, Second Circuit. April 16, 1895.)

### No. 95.

FACTORS—PLEDGE—NEW YORK STATUTE.

L. & Co., merchants at Dundee, entered into an agreement with B. & Co., bankers at London, by which, in consideration of the acceptance by B. & Co. of drafts drawn against shipments to L. & Co.'s New York house, they agreed to deliver to B. & Co. the bills of lading of such shipments, which should then be regarded as consigned by B. & Co. to L. & Co.'s New York house, the proceeds to be specially accounted for, as soon as the goods were sold. Goods were shipped, and drafts drawn and accepted, pursuant to this agreement, for a considerable time, but no special remittances of proceeds were made, B. & Co. not requiring the same so long as they were kept in funds to meet the drafts. When shipments were made, the bills of lading and other documents were sent by L. & Co. to B. & Co. in London, and by them, in turn, delivered to L. & Co.'s New York house, enabling them to take the goods from the customhouse and deal with them as their own, and taking, in return, a so-called

"trust receipt," by which L. & Co. acknowledged receipt of the goods, on consignment from B. & Co., and agreed to remit the proceeds specially. The goods, when received by L. & Co. at New York, were placed in a bonded warehouse, and receipts taken for them, and were afterwards delivered, from time to time, on orders of L. & Co., to persons to whom they were sold, L. & Co.'s dealings being large, and shipments being received every two or three days, and deliveries made from day to day. About the time of their agreement with B. & Co., L. & Co. established with the bonded warehouse a course of dealing by which the warehouse issued negotiable "open receipts" to L. & Co. for certain specified quantities of burlaps, without specifying any particular bales, and held, against such open receipts, those bales which had been longest in store, delivering on L. & Co.'s orders the oldest bales, and substituting later bales under the open receipts, holding always a sufficient quantity to cover the outstanding open receipts, under which the holders could at any time call for the quantities specified in the receipts, from the warehouse. In September, 1892, the N. Trust Co. made a loan to L. & Co. solely upon the security of certain of the open receipts of the warehouse for bales of burlaps. About the same time, B. & Co. accepted drafts against a shipment of burlaps, and forwarded the bills of lading, etc., according to their custom, to L. & Co. at New York, who placed the goods in the warehouse, the owners of which had no notice of any interest of any other persons than L. & Co. in such goods. In December, 1892, L. & Co. failed, and, at that time, by the process of transfer in the warehouse, the bales of burlaps consigned by B. &. Co. to L. & Co. at New York in September were held under the open receipts in the hands of the N. Trust Co., as security, and, upon the request of the N. Trust Co. for a new receipt in its own name, were held under such receipt. *Held*, that the pledge of the open receipts to the N. Trust Co., as security, gave that company a valid lien upon the bales then in store; that the release of older bales constituted a valuable consideration for subjecting the new bales, as deposited, to the same lien; and that, under the New York factors' act (Laws 1830, c. 179), providing that every factor or agent, intrusted with the possession of a bill of lading or other document, or of merchandise, for sale or as security, shall be deemed the owner so as to give validity to a sale of or advance upon the same, the N. Trust Co. acquired a lien upon the bales consigned by B. & Co. to L. & Co. at New York, superior to the rights of B. & Co.

In Error to the Circuit Court of the United States for the Southern District of New York.

This was an action by Benjamin W. Blydenstein and others against the New York Security & Trust Company to recover the proceeds of certain merchandise, to which both parties claimed title. A demurrer to one of the defenses interposed by the defendant was sustained. 59 Fed. 12. Upon the trial of the remaining defenses a verdict was directed by the court, and judgment entered accordingly. Plaintiffs bring error.

This is a writ of error to review a judgment of the United States circuit court in favor of the New York Security & Trust Company, the defendant below, upon a verdict rendered upon the issues by direction of the court. The assignment of errors is confined to the rulings of the court upon the direction of the verdict. The following excerpt from the brief of defendant in error concisely states the manner in which the legal questions arising upon the evidence were presented to the court below: "The New York Security & Trust Company had sold certain 38 bales of burlaps under a stipulation with Blydenstein & Co., the plaintiffs, that the proceeds should stand in place of the bales, subject to the same claim as the respective parties had to the bales themselves, and had realized from the sale in January, 1893, net, $4,347.98. This sum of money Blydenstein & Co. demanded of the trust company, and the trust company refused to pay. Both Blydenstein & Co. and the trust

company claimed title to the bales and their proceeds from and through certain manufacturers and importers doing business under the name of Lipman & Co., understanding, respectively, that they had received such title, and intending to receive such title, as security for loans made by them, respectively, to Lipman & Co. The legal questions are: (1) Had Blydenstein & Co. at the time when the bales were sold any title at law (or even in equity) to the same? (2) If so, was that title superior to the title of the New York Security & Trust Company?"

Antonio Knauth, for plaintiffs in error.
Wm. B. Hornblower, for defendant in error.

Before BROWN, Circuit Justice, and WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. The facts in the case are complicated, and a complete presentation of them is necessary to a proper understanding of the legal points involved. The plaintiffs are bankers doing business in London, England. Lipman & Co. were manufacturers and importers of merchandise doing business in Dundee, Scotland, and having a branch office in New York under the control of one Gutman as their general agent. Wishing to obtain advances upon shipments to this country, Lipman & Co., on October 14, 1891, applied in writing to Blydenstein & Co., proffering a general stipulation or agreement as to the future conduct of any such business to be carried on between them, which proposed agreement proved acceptable to the plaintiffs. It reads as follows:

"Dundee, Oct. 14, 1891.

"To Mess. B. W. Blydenstein & Co.—Dear Sirs: In consideration of such advances as you may from time to time make to us, by your acceptance of drafts drawn by us on you against goods shipped by us to Lipman & Co., New York, for sale by our house there, we beg to state the understanding and agreement between us in regard to all such transactions, which is as follows: The complete set of the bills of lading of the goods as shipped are to be delivered by us to you, the goods being by such bills of lading made deliverable to you or to your order, and until full repayment of your advance such bills to be treated and considered as your property, and as simply consigned by you to our New York house for sale on your account, and the net proceeds of such sale as and when received are to be specially remitted by them to you direct in the first-class bills on London. As such you will kindly, from time to time, transmit the bills of lading as received by you from us to our house at New York, with the needed instructions to deal with the goods. We undertake that remittances from New York to meet the amount of your acceptances shall be in your hands not later than two days prior to the maturity thereof, and failing such remittances, or to the extent to which the same shall be insufficient to cover your advance, with interest, commission, and charges, we engage to pay you the amount in cash in London prior to the maturity of the bills, or any renewal thereof; the intention being that you are at all times to be kept by us out of cash advance, which we hereby undertake to do accordingly.

"Yours, truly, Lipman & Co."

Subsequently, and down to the time of the failure of Lipman & Co., in December, 1892, plaintiffs accepted drafts against shipments of merchandise by Lipman & Co. The 38 bales in controversy consist of two lots, 22 of them having come over in September, and 16 of them in December, 1892. A statement of the transactions as to a single lot will be sufficient, since in each case, mutatis mutandis,

the course of events was the same.　On September 5, 1892, Lipman & Co. mailed to the plaintiffs in London a copy of an invoice of 50 bales of burlaps (including said 22 bales) shipped per steamer Aberdeen to London, and thence per steamship of the A. T. Line to New York, for £1,094. 4s. 3d., and another for 40 bbls. of glue, shipped by Britannia, for £174. 3s. 8d., together with two bills of lading for each shipment, indorsed in blank by Lipman & Co.　They drew against the same upon plaintiffs for £1,268. 7s. 11d., which draft was accepted, discounted in the open market, and at maturity paid by Blydenstein & Co.　Except for the small shipment by Britannia, the amount thus paid on this acceptance has not been received by plaintiffs from Lipman & Co.　At or about the same time Lipman & Co. sent the third bill of lading indorsed in blank, with the two consular invoices, containing the affidavit of one of the partners of Lipman & Co. to the effect that he was one of the owners of the merchandise, to the general correspondents of Blydenstein & Co. in New York, the banking firm of Knauth, Nachod & Kuhne.　On September 7, 1892, plaintiffs forwarded to this last-named firm the invoice and the two bills of lading received from Lipman & Co., and also a letter from Blydenstein & Co. to Lipman & Co., and an unsigned letter of reply thereto (called a "trust receipt"), with a request that Knauth, Nachod & Kuhne would hand plaintiffs such trust receipt and the proceeds in due course.　The letter to Lipman & Co. is as follows:

"London, Sept. 5, 1892.

"Messrs. Lipman & Co., New York—Dear Sirs:　Inclosed we beg to hand you bills of lading of 50 bales jute goods and 40 barrels glue shipped to New York per Aberdeen and Britannia to your consignment.　These documents have been received by us from your Dundee house, to whom we have made an advance against the same, the shipping documents and goods represented thereby being our security for the repayment of our advance.　As such you must please treat them as our property, and as simply consigned by us to you for sale on our account, and the full net proceeds thereof, as and when received, are to be specially remitted by you to us direct in first-class bills on London, and meanwhile you must keep any such proceeds separate and distinct from all your other funds, and as simply in your hands held for us, and as our special property.　To carry out and give effect to this arrangement, please sign the inclosed letter of acknowledgment, and return the same to us, duly dated, by the first mail.

"Yours, truly,　　　　　　　　　Blydenstein & Co."

On September 15, 1892, Knauth, Nachod & Kuhne turned over to Gutman, as general agent for Lipman & Co., all the bills of lading, consular certificates, and invoices, together with the letter last above set forth.　Thus the goods, which had gone out of the possession of Lipman & Co. when they transferred the bills of lading to the plaintiffs and plaintiffs' correspondent, came again into the possession and control of that firm, since they now held all the shipping and customhouse documents necessary to obtain manual delivery. Upon receipt of these documents Lipman & Co. dated and signed the following letter, or so-called "trust receipt":

"New York, Sept. 15th, 1892.

"Dear Sirs:　We beg to acknowledge the receipt of your letter, copy of which is annexed, covering bills of lading of 50 bales jute and 40 barrels

glue per Aberdeen and Britannia, consigned to us by you for sale on your account, and which, as also the said goods on their arrival, and the proceeds thereof when sold, we hereby engage specially to hold in trust for you accordingly in terms of your said letter, and as and when the goods are sold to remit to you direct, in first-class bills on London, the full net proceeds thereof, or to pay the same to your correspondents, Knauth, Nachod & Kuhne, of this city.

"Yours, truly,                          pp. Lipman & Co.,
                                              "Ludwig Gutman.

"Messrs. Blydenstein & Co., London."

This trust receipt was at once sent to plaintiffs by Knauth, Nachod & Kuhne. The course of proceedings above described was pursued with all the shipments of Lipman & Co. against which plaintiffs accepted drafts from October, 1891, down to the latter part of 1892. It is a suggestive fact that never from the beginning to the end of the transactions were any "full net proceeds" of any sale of goods so shipped "specially remitted," either as soon as received from the sale or at any other time. Nor was any account of sales ever rendered to Blydenstein & Co. nor ever requested by them. So long as Lipman & Co. paid the drafts, neither plaintiffs nor their correspondents concerned themselves whether the proceeds of sales of any shipments exactly corresponded to the amount of the remittances, nor whether there was a profit or a loss on any sale.

Being thus possessed of all the necessary documents, Lipman & Co., on September 29, 1892, entered the 50 bales of burlaps (with 61 others) at the customhouse, and on the same day a permit was issued by the customs authorities directing that the merchandise be sent to the bonded warehouse, Rossiter's Stores. These stores belong to the Terminal Warehouse Company, and, before noting the deposit of the 50 bales therein, it is desirable to review the course of business between Lipman & Co. and the warehouse company. The oral testimony on this branch of the case is somewhat involved, but from it and the various exhibits the course of business appears to be as follows:

Lipman & Co. began to deposit merchandise with the Terminal Warehouse Company a year or more before the failure. Whenever any bales of burlaps were delivered to the warehouse, a nonnegotiable receipt was given for them. This document was dated and numbered, and stated that there were "received from Lipman & Co. on storage in Rossiter Stores, and subject to their order," so many bales said to contain burlaps. It sets forth in most instances the marks and numbers of the bales, and the vessel from which they came, and contained the words "Not negotiable." This receipt was practically a memorandum that the goods are in store. It was not returnable or necessary to be returned, but the goods named therein were to be disposed of (storage charges and duties being paid) agreeably to whatever directions might thereafter be given by Lipman & Co. They entered the receipt of such goods in their books, and apparently kept the nonnegotiable receipts in their possession, such receipts being valuable in the event of any dispute with the warehouse company as to whether

any particular goods had or had not been received, but not in any other way made use of in conducting the business. Lipman & Co. were in the habit of putting in and taking out goods daily. They had two or three or more shipments every week, so that there was a continual going and coming of goods. There were days when Lipman & Co. had 3,000 and 4,000 bales in the warehouse, and may be more, and on other days less. They always kept a large number of goods on balance from which they could draw. They sold goods from day to day, and sent to the warehouse from time to time for such goods as they had sold or contracted to sell, and these withdrawal orders were of course obeyed without production of the nonnegotiable receipt. The stores were in a United States bonded warehouse, and no goods could be removed without a customhouse permit. That permit gave marks and numbers, so that when an order to deliver sold goods was received the permit identified the goods. Besides the orders to deliver to purchasers goods which had been received, and for which nonnegotiable receipts had been given, Lipman & Co. gave in some cases, as will now be shown, other orders as to their disposition. Apparently, in 1891, certainly in December of that year, that firm commenced the practice of so-called "open" or "negotiable" receipts, and Gutman arranged on their behalf with the officials of the warehouse company as to the form of such receipts. The value of a bale of burlaps depends upon its weight, and the prices by the bales are about the same, because a bale containing shorter yardage contains heavier weight goods, and the lighter the cloth was by the yard the larger the yardage in the bale, so that the weight of the bale would be about the same. Apparently all the burlaps warehoused by Lipman & Co. were of their own manufacture, and substantially uniform. There was testimony to show that there is a custom in the case of certain staple commodities to issue what are known as "open warehouse receipts," covering a named quantity, but not giving marks and numbers, the quantity remaining constant, but its constituent units subject to change by substitution. Such receipts are given for wool sometimes that comes in bulk, and generally when they are asked for. Lipman & Co., wishing to avail themselves of this custom, asked on December 1, 1891, for open or negotiable receipts, covering 500 bales, requesting that such receipts should not specify the various marks, so that Lipman & Co. could take out bales and put in new bales without always making out new receipts. At that time they had 801 bales in store, and the warehouse company issued five negotiable receipts for 100 bales each. Each of these receipts, below the heading, receipt number, and date, contained these words:

Received in Rossiter Stores, No. 4 U. S. bonded, on storage for account of Lipman & Co.

| | |
|---|---|
| Marks: | Contents unknown.   Said to contain |
| various (100). | 100 bales burlaps. |

Negotiable.

Deliverable only upon return of this receipt and the payment of charges accrued thereon.

**It was signed by an officer and the manager of the company.  On the back was printed:**

The property mentioned below is hereby released from this receipt for delivery from warehouse.

| Date. | Quantity. | Merchandise. | Signature. |
|---|---|---|---|

The agreement expressed in this document is plain.  The warehouse company undertook to deliver 100 bales of the burlaps stored with it by Lipman & Co., either to Lipman & Co. or to their assignee, but only upon the return of the receipt.  It undertook to so manage its warehousing that it should always, while the receipt was outstanding and the amount called for by such receipt was not reduced in quantity by a properly executed release indorsed thereon, have on hand and ready for delivery the quantity of such bales called for by the receipt, but it did not undertake so to deliver bales with any particular marks.  As above stated, on December 1, 1891, five of these open receipts were issued, and from time to time, during the year 1892, other open receipts for upwards of 1,100 bales were also issued.  Although the bales covered by these five open receipts were not specified therein by marks, there were in the warehouse when they were issued bales sufficient to meet them and 301 additional bales.  On the same day, however, December 1, 1891, other negotiable receipts were issued; how many of them does not appear, but they covered an aggregate of 301 bales, of which 15 were described on the receipt by marks, the others being not so described.  Lipman & Co. thereafter continued to deposit goods in warehouse and to sell burlaps, and to call for deliveries to their purchasers, and to produce customhouse permits.  These permits, as was said before, identified bales by marks and numbers, and in the course of time they thus called for all the 801 bales which were in warehouse when the open receipts of December 1, 1891, were issued.  By that time, however, new goods which were not in store on December 1, 1891, and for which only nonnegotiable receipts "subject to their order" had been issued to Lipman & Co., had been warehoused.  Acting, then, in accordance with the arrangement made with that firm, whereby, as Gutman testifies, "they could take out bales and put in new bales without always making out new receipts," only seeing to it, when they took out goods, "the limit did not go below the amount for which the warehouse company had issued open receipts," the company filled Lipman & Co.'s orders for the delivery of the old goods, and at the same time substituted, in their place as bales to be held to make up the amount of outstanding open receipts, a sufficient number of such new bales as were still subject to Lipman & Co.'s order under the nonnegotiable receipts.  The oldest bales were always held for delivery on the open receipts, and when those were delivered the next oldest bales were substituted.  Gutman testifies in one part of his examination that he did not give any instructions to the warehouse company as to whether any of these goods which he subsequently sent there should be substituted for others.  This statement does not harmonize with the rest of his testimony, unless it means that he did not give specific instructions in each specific case of sub-

stitution. Specific instructions in each case, however, were unnecessary. On behalf of Lipman & Co., he had asked for open receipts, which should not contain any marks, for the express purpose, as he testifies, of enabling Lipman & Co. "to take out bales, and put in new bales, without always making out new receipts." When, after making such an arrangement with the warehouse company, Lipman & Co. called for deliveries of all or a part of the bales which were on hand when the open receipts were issued, without returning such open receipts, such call was a plain notification that they were availing themselves of their privilege of substituting new bales for old, and as to such new bales as the warehouse held "subject to their order" was in itself an order to substitute a sufficient number of them, in place of the called bales, to meet the outstanding open receipts. As time went on, and these substituted bales became old stock, and were themselves withdrawn, other new goods were substituted in their place, and at no time did the number of bales of Lipman & Co.'s burlaps fall below the amount called for by outstanding negotiable or open receipts. During all these transactions all evidences of title to the goods were in the possession of Lipman & Co., and the warehouse company had no notice that the goods stored with it were claimed to be the property of any one other than that firm.

On September 7, 1892, the defendant herein, the New York Security & Trust Company, loaned to Lipman & Co. the sum of $50,000, on their note for four months, accompanied with a pledge, in the usual form of a collateral note, of the five receipts of the Terminal Warehouse Company dated December 1, 1891, each for 100 bales burlaps. At the time of the loan and pledge they delivered to the trust company the five receipts, and before the loan was made the trust company sent one of its clerks with Gutman to the warehouse, where there were pointed out to him bales of burlaps of Lipman & Co. aggregating more than 500. Thereupon, not being advised that any one else had any claim to the goods, finding the warehouse keeper's receipt to be in the name of Lipman & Co., and having the additional assurance from the clerk's inspection that the bales of burlaps were actually in the warehouse, the president of the trust company made the loan, paying no attention to the financial standing of Lipman & Co., but induced to make it by the borrowers' pledging collateral for it, and relying upon the warehouse receipts as evidence of Lipman & Co.'s ownership of such collateral.

Returning, now, to the 22 bales (part of the lot of 50 bales) for which the customhouse permit to land and warehouse was issued on September 29, 1892, we find that on October 6, 1892, the warehouse company delivered to Lipman & Co. 22 old bales of burlaps, which it had on storage, and received in exchange from that firm the 22 new bales, permitted September 29, 1892. For these a nonnegotiable receipt was given. It does not appear whether the withdrawal of the old 22 bales reduced the total quantity that was in warehouse prior to October 6th below the aggregate amount of all outstanding open receipts, so that the substitution of these specific 22 new bales for old was made on that day; but it is certain that

eventually the withdrawals made it necessary for the warehouse company to substitute these 22 bales for bales withdrawn, so that the amount called for by open receipts should not be reduced by such withdrawal, and it did so. Whenever it did in fact make this substitution, however, the warehouse company gave up and delivered to Lipman & Co. or on their order an equal number of bales, which, under the arrangement between them as already explained, had theretofore been substituted for still earlier bales upon the open receipts; and, as it appears affirmatively from the evidence that the amount of bales in store never fell below the amount named in outstanding open certificates, such substitution and withdrawal, whenever it did occur, was a single transaction.

It will not be necessary separately to rehearse the transactions as to the lot of 16 bales. They are substantially the same, the bales being received at the warehouse on December 8, 1892, in exchange for 16 old bales, at the same time redelivered by the warehouse to Lipman & Co. On October 31, 1892, Lipman & Co. paid to defendant on account of the loan $10,000, and received back from defendant one of the open receipts, which was thereupon turned in to the warehouse company, and canceled November 1, 1892, 100 bales being thus left open to Lipman & Co.'s order; and on November 4, 1892, the further sum of $20,000 was paid, and two more open receipts were returned and canceled, 200 more bales being thus set free. On October 31, 1892, for what reason the testimony does not disclose, Lipman & Co. executed on the back of the two remaining open receipts an assignment thereof in blank. On or about December 14, 1892, the firm failed. Thereupon, and on December 15th, the trust company presented to the warehouse company the two remaining negotiable receipts of December 1, 1891, thus indorsed in blank by Lipman & Co., and gave them up, receiving in exchange a single similar receipt for 200 bales, "marks various, on storage for account of New York Security & Trust Company." On December 15th there were 204 bales of Lipman & Co.'s burlaps in the warehouse, of which 4 bales, "diamond L., Nos. 2,447, 2,448, 6,364, and 6,365," were claimed by Haynes, Lord & Co., having been sold to them on August 15, 1892, and no negotiable or open receipts covering any of Lipman & Co.'s burlaps were outstanding except the two presented on that day by the trust company. The note of Lipman & Co. was not paid at maturity, and the trust company sold the 200 bales, and applied the proceeds towards its liquidation. The 38 bales declared on in the complaint were included among these 200 bales.

Upon this state of facts the trial judge held that the original transaction in London was that of pledgor and pledgee, accompanied by symbolic delivery of the pledged property to the pledgees, the goods being then upon the ocean; but that assuming that by virtue of the London agreement the legal title to the property became vested in the plaintiffs, and the firm of Lipman & Co. subsequently became their factors, a valid lien was obtained by the trust company, under the New York factors' act, upon the 200 bales in the warehouse on December 15, 1892, including the 38 bales which are the subject of this suit. Verdict was directed for the defendants. The New York

factors' act is chapter 179 of the Laws of 1830, and its third section provides as follows:

"Sec. 3. Every factor or other agent entrusted with the possession of any bill of lading, custom-house permit, or ware-house-keepers' receipt for the delivery of any such merchandise, and every such factor or agent not having the documentary evidence of title, who shall be entrusted with the possession of any merchandise for the purpose of sale, or as security for any advances to be made or obtained thereon, shall be deemed to be the true owner thereof, so far as to give validity to any contract made by such agent with any other person, for the sale or disposition of the whole or any part of such merchandise, for any money advanced, or negotiable or other obligation in writing given by such other person upon the faith thereof."

It has been held by the state courts that the object of this act was to modify and make certain the general common-law rule that where one of two innocent persons must suffer loss from the act of a third person, such loss shall be borne by him who has placed the third person in the position which enabled him to do the act causing the loss; that it made the factor's possession such evidence of ownership as to enable him to do all acts which the true owner might, requiring the owner to use his precautions when he selected his factor, and thereafter leaving him to be responsible for the acts of his agent, and protecting a bona fide third person in any transaction fairly effected with the apparent owner; and they hold that the statute should be liberally construed. Cartwright v. Wilmerding, 24 N. Y. 521.

Assuming that the ownership of the goods passed from Lipman & Co. to the plaintiffs in London, and did not pass back by the subsequent transaction, Lipman & Co. were indisputably factors intrusted with the possession both of the documentary evidence of title and of the goods. Cartwright v. Wilmerding, 24 N. Y. 521; Pegram v. Carson, 10 Bosw. 505. As such, they are to be deemed the true owners so far as to give validity to any contract they might make with any other person of the kind enumerated in this section of the factors' act. The contracts enumerated are: (a) Contracts for sale of such merchandise for advances of money, or negotiable or other obligations in writing given by such other person. (b) Contracts for any other disposition of such merchandise (as, for example, a pledge thereof) for advances of money, or negotiable or other obligation in writing given by such other person, provided that such contract is entered into by such other person upon the faith of the factor's possession of the merchandise or of the documentary evidence of title thereto or of both. In other words, the factor may dispose of the merchandise in any way he pleases,—just as an owner might,—and if the person who, because of such disposition, advances money or gives a negotiable or other obligation in writing, does so on the faith of the apparent ownership with which possession clothes the factors, the law will hold that apparent ownership to be real. Lipman & Co. were in possession of the 801 bales in warehouse on December 1, 1891. Indeed, for aught that appears in the case, it may be assumed that they were the owners, nor in fact is there anything to show that they were not the owners, of all the bales which from time to time thereafter they deposited there-

in, except the 38 bales in suit. There is no need, therefore, to turn to the factors' act for support of the proposition that the contract then made with the warehouse company as to the disposition of such bales was a valid one. No authority cited on the argument gives support to the proposition that there is anything unlawful or contrary to public policy in an agreement between bailor and bailee whereby the latter contracts to hold and safely keep a specified quantity of the bailor's goods, and to give such quantity up only on presentation and redelivery of a receipt which the bailee signs, nor in the further agreement between them that whenever the bailor, without presenting the receipt, asks to withdraw a part of or even the whole quantity covered thereby, he may be allowed to do so upon substituting a, like quantity of the same goods in their place, but shall be refused any of his old goods unless he does offer such substitute. The New York warehouse act (Laws 1858, c. 326, § 6) no doubt prohibits the delivery of any property covered by a warehouseman's negotiable receipt, except on surrender or cancellation of such original receipt, or an indorsement thereon in case of partial delivery; but it seems an overstrict construction of that act to extend its prohibition to a case where the total amount of a staple commodity in warehouse is increased by the depositor beyond the quantity stated in some negotiable receipt, and then reduced by withdrawals to an amount equal to that stated in such receipt, the well-known method of transferring grain in bulk, which is one of the commodities expressly enumerated in the section.

On September 7, 1892, when the trust company discounted Lipman's note, that firm was in possession of the 500 bales, which, whether original or substituted, were held by the warehouse against the outstanding five receipts. For aught that appears in the case, Lipman & Co. owned all these bales; but, if they did not, they certainly were intrusted with the possession of them, and as certainly the loan was made by the trust company upon the faith of such possession. The contract evidenced in the collateral note, whereby Lipman & Co. pledged the 500 bales which the five December negotiable receipts called for, was therefore valid, and it is difficult to see how it could be affected by the circumstance that there had theretofore been changes in the units, the aggregate being the same, and precisely what the receipts called for, viz. 500 bales of Lipman & Co.'s burlaps of various marks and numbers. Upon these 500 bales the trust company, by the contract of September 7, 1892, obtained a valid lien to the extent of its advances. There was much discussion on the argument as to whether or not the transfer of open receipts which called for a given quantity only, without specifying marks or numbers, would constitute a present pledge of anything. It is unnecessary to review the various authorities, or to determine to what extent the rules of law which have been applied to grain in bulk (Kimberly v. Patchin, 19 N. Y. 330); to bricks in a kiln (Crofoot v. Bennett, 2 N. Y. 258); to barrels of flour (Pleasants v. Pendleton, 6 Rand. [Va.] 473); to mill culls (Wagar v. Railroad Co., 79 Mich. 648, 44 N. W. 1113); and to apple barrels (Carpenter v. Graham, 42 Mich. 191, 3 N. W. 974),—apply to bales of burlaps, substantially alike in

kind, quality, and value. The objection is based on the assumption that not only did the receipts fail to state what bales were pledged, but that when the pledge was made the pledged bales referred to in the five receipts were in no way segregated from those not pledged. This, however, is not the testimony. It is true that the warehouse-man was unable, at the time of the trial, to tell which bales, by marks and numbers, were evidenced by these five negotiable receipts on December 1, 1891, but he by no means testified that they were not known *then*. On the contrary, he expressly stated that "on December 1st, if you had called, we could have given you the list,—an exact list of every bale." No permanent record of the memoranda by which new bales were substituted in place of bales withdrawn was kept, so that the witness was unable at the trial to state the bales which in succession were represented by each open receipt ever since it was issued by the company; but substitution for old bales, when made, was made from the next oldest bales, and while the memoranda themselves existed there could have been no difficulty about determining which these were. Had the transaction of September 7, 1892, been a sale of 500 bales evidenced by the December receipts, the warehouse company would not, so far as the evidence shows, have had any difficulty in producing from the total quantity in store on that day the bales which, by the process of substitution arranged for between its officers and Lipman & Co., had taken the place of those originally on December 1st held by it to meet the negotiable receipts.

The trust company, therefore, on September 7, 1892, obtained a valid lien on 500 bales of Lipman & Co.'s burlaps then stored in the warehouse. Thereupon the warehouse company became its bailee, and held the bales for it. Gibson v. Stevens, 8 How. 384. Whenever thereafter Lipman & Co. asked to substitute other similar goods of their own for those originally delivered as collateral, the surrender of an equal quantity of the original security of equal value would be a valuable consideration for the giving of the new security. The pledgee as to the latter would be a holder for value, and the exchange would have no effect upon the rights of the pledgee as founded upon the original contract. Colebrooke, Col. Sec. § 15; Clark v. Iselin, 21 Wall. 360. The same rule should apply where the goods offered in substitution and in exchange, for which goods already pledged are surrendered, are such as have been intrusted to the factor in the manner provided for by the factors' act, when the surrender is made upon the faith of the factor's possession. The contract for disposition of such goods is not for "advances of money," but it would be too narrow a construction of the state statute, which, according to the decisions of the state courts, should be liberally construed, to hold that one who parts with money's worth in the form of valuable property is deprived of its protection because he did not first transform such property into cash. When, therefore, Lipman & Co., after having deposited the 38 bales in warehouse subject to their order, called upon the warehouse company to deliver 38 bales already covered by the pledged receipts, and with no older free bales than these to substitute in their place, they did in fact apply for an exchange of part of the security collateral to their loan, thus offering

to pledge the new 38 bales if the old ones were delivered to them. The offer was accepted, and, on the faith of their possession of the bales which they thus offered to pledge, the older bales were given up to them. This was a valuable consideration, parted with in good faith, and entitles the person paying it to the protection of the facters' act, as against the plaintiffs who had intrusted Lipman & Co. with the possession of the goods. The trust company on December 15, 1892, had a valid lien on all of the 200 bales remaining in the warehouse under the two uncanceled open receipts of December 1, 1891, and they certainly did not lose such lien by returning the original receipts to the warehouse, and accepting in exchange a single one in their own name for the full account. The judgment of the circuit court should be affirmed.