JENKINS, Circuit Judge,
upon this statement of the case, delivered the opinion of the court.
We held when this case was previously before the court that the appellants, as pledgees of the 125 bonds, were not entitled to an equitable lien upon the remaining 122 bonds. That ruling is res judicata. The amended cross bill presents the appellees in the character of judgment creditors, so that they are now entitled *980 to question the transaction by which Mary B. Hook claims to have acquired the ownership of the remaining 122 bonds, unless they are estopped by the transaction between William S. Hook and two of the appellees with respect to the sale to Hook of their interest in the Chicago, Peoria & St. Louis Syndicate, or, if not technically estopped, unless the firm is bound by notice of this transaction. Our attention will first be directed to the question whether there was in fact any valid pledge of the 122 bonds by the Jacksonville Southeastern Railway Company to William S. Hook, or to any other person, for the benefit of the syndicate. The cross bill proceeds upon the theory that these bonds never passed from the custody of the railway company, and are still its property. The answer asserts the pledge, and assumes the burden of its proof. The fact of the pledge, if one there was, rests wholly upon the testimony of William S. Hook and Marcus Hook. So far as the evidence discloses, there was no action by the directors of the company authorizing such pledge, nor any knowledge by them of the intention of Hook, as president, to make such pledge, except as herein stated. Nor is there any written pledge of any kind, nor any entry in the books produced from which such pledge could be inferred, except possibly the entry of October 1, 1889, in the books of the syndicate company, by which, after the purchase of his fellows’ interest in the syndicate, William S. Hook charged to himself, at a stated sum, these 122 bonds, which transaction cannot be sanctioned, and is not defended by counsel. William S. Hook testifies that in December, 1S87, at the time of the pledge of the 125 bonds to the appellees, he stated to Augustus E. Ayers, one of the appellees, that he intended to hold the 122 bonds to secure the syndicate for advances made by the Chicago, Peoria & St; Louis Company; that “at practically the same time” he deposited the 122 bonds with the American Exchange National Bank of New York, subject to the order of T. J. Hook & Co. This claimed deposit was by an order on the trust company in New York, which was trustee under the mortgage securing the bonds. T. J. Hook & Co. was William S. Hook, and none other. The transaction, therefore, was in plain English, this: William S. Hook, as president of the Louisville & St. Louis Railway, delivered its bonds to the trustee under the mortgage for countersigning and delivery to William S. Hook as president of the Jacksonville Southeastern Railway. William S. Hook, as president of the latter company, ordered the trustee to deliver them to the American Exchange Bank, to be held subject to the control and direction of William S. Hook. This firm of T. J. Hook & Co. was engaged in no business except that of keeping this bank account with the American Exchange National Bank, and the only person interested in it was William S. Hook. The Jacksonville Southeastern Railway Company was not indebted to the firm of T. J. Hook & Co. Mr. Hook declares the firm never purchased these bonds; never held them, except upon his own motion, as custodian, to protect advances made by the Chicago, Peoria & St. Louis Syndicate to the Jacksonville Southeastern Railway Company. It does not appear *981 that in December, 1887, any advances had been made by the syndicate to the Jacksonville Southeastern Railway; nor does it appear when any such advances were made, except that on May 31, 1888, William S. Hook, as president of the Jacksonville Southeastern Railway Company, executed to the Chicago, Peoria & St. Louis Railway Company a promissory note for $05,000 on account of money advanced and expended in the construction of the Louisville & St. Louis Railway. This note was delivered to Marcus Hook as treasurer of the Chicago, Peoria & St. Louis Railway Company, and with and as collateral to the note of the latter company for á like amount, and, by the direction of William S. Hook, passed from Marcus Hook as treasurer to Marcus Hook individually, “to be held as trustee for the benefit of the syndicate.” Soon after the execution of these notes, the members of the syndicate executed receipts for the dividend declared by the syndicate, but received no money therefor; and Marcus Hook declares that at that time he explained to each member of the syndicate that he held these notes, and that they were secured by the 122 bonds “which were under my control as collateral.” He never had control or possession of them. He had only been authorized by William S. Hook to sign checks in the name of T. J. Hook & Co. These bonds never passed beyond the control of William S. Hook, or out of his custody. In June, 1889, William S. Hook purchased the interest of the other members of the syndicate; and thereafter, in October, 1889, he directed an entry upon the books of the syndicate or the company controlled by the syndicate, crediting upon the $65,000 notes the sum of $61,000, as the value of the 122 bonds which at the time were in the bank in the city of New York subject to the order of T. J. Hook & Co. It may be that William S. Hook intended to hold these 122 bonds as security for such advances as the syndicate should make to the Jacksonville Southeastern Railway Company. But the intent to pledge does not constitute a pledge. It was ruled in Casey v. Cavaroc, 96 U. S. 467; that delivery and possession are of the essence of a pledge, and without them no privilege can exist as against third persons. There must be delivery to, and possession by, the pledgee. Christian v. Railroad Co., 133 U. S. 233, 10 Sup. Ct. 260. Story, in his treatise on Bailments (section 297), observes:
“Until the delivery of the thing, the whole rests in an executory contract, however strong may he the engagement to deliver; and the pledgee acquires no right of property in the thing.”
It is clear, upon this record, that there never was any delivery of these bonds to Marcus Hook as trustee. The only possible control or right that he had to deal with them was as the agent and servant of William S. Hook, under his authority to sign checks in the name of T. J. Hook & Co. He does, indeed, declare that he stated to the members of the syndicate that these bonds were under his control; but, as matter of fact, the bonds were at all times, from their inception down to the time when he says he gave them to his wife, in the custody and under the control of William S. Hook. The delivery of these bonds to the trust company by the *982 company making them was a delivery to the Jacksonville Southeastern Railway Company, and to William S. Hook as its president. The deposit of them in the New York bank to the credit of T. J. Hook & Co., which was an alias of William S. Hook, did not dispossess the company of these bonds. He still held them as president of the company, and they remained under his control. Whatever his intention with respect to a pledge of the bonds, it was never effectuated by any action of the owner of them, or by delivery of them to Marcus Hook, the trustee of the syndicate, who held in trust the notes of the two railway companies. There was no delivery to him of the bonds. They never passed from the possession or control of William S. Hook, and his possession of them was the possession of the Jacksonville Southeastern Company. Nor do we discover sufficient ground to apply the doctrine of equitable pledge. That doctrine rests upon the idea that the possession of the thing remained with the owner, and that by some executory contract, expressed or implied, a right or interest in the thing has been created, which equity will recognize and enforce, upon the maxim that equity will regard as done that which ought to be done. There must, however, be a contract from which it sufficiently appears that the particular property was designed by the debtor to be subjected to the payment of the debt. Here was no such contract. William S. Hook asserts that he declared his intention to hold the bonds as security for advances which might be made by the syndicate. He says that he took them into his personal possession by subjecting them to the order of T. J. Hook & Oo. This act, however, was not authorized by the railway company. Nor can it be permitted that as president of the company, and without the sanction of its directors and shareholders, he may contract with himself to the detriment of its creditors and shareholders. If the company, by its directors, had sanctioned the acts of William S. Hook with respect to those bonds, there might be sufficient shown to call for the application of the doctrine invoked. It would, however, be dangerous to declare that one in a representative capacity may so contract with himself, without the knowledge or acquiescence of those whom he represents, that an equitable pledge upon the property of the company could be asserted and enforced. It was so simple a matter to have procured such declaration of pledge, either legal or equitable, which a court of equity would recognize, that the want of such action casts suspicion upon the transaction, and especially in a case in which an officer of the corporation is dealing with himself. So far as we can discover, there existed merely an intention on the part of William S. Hook that the bonds should be pledged to the syndicate, unaccompanied by any act of the debtor company. The intention to pledge was that of the creditor, not of the debtor, and upon that there cannot properly be invoked the doctrine of an equitable pledge.
We are next to inquire whether the appellees are estopped to assert that these bonds are the property of the Jacksonville Southeastern Company. Marshall P. Ayers and John A. Ayers were members of the syndicate, and disposed of their interest therein *983 to William S. Hook with knowledge that he claimed the 122 bonds to be held in trust as collateral security for the claim of the syndicate. They received the money of William S. Hook with that knowledge. He parted with his money to them, relying, as they well knew, upon holding these bonds as collateral security to the debt he purchased. We said before, possibly obiter, and the majority of the court is still of opinion, that they are estopped by their contract of sale. That the claimed pledge of the bonds is ineffectual as against creditors and shareholders cannot weaken the effect of the estoppel. The supposed pledge fails through defective action, which, so far as their own rights are concerned, Marshall P. Ayers and John A. Ayers could perfect, and did sanction by taking the money of William S. Hook with knowledge of his claim. These two men cannot therefore now be heard to question a transaction which they have thus approved, and in the avails of which they have participated. The sale of the interest in the syndicate transferred the debt and that which secured the debt. We do not attempt to vary, or in fact vary, the terms of the written contract. It is not the case of an independent oral agreement inconsistent with the stipulations of the written contract. It is merely the application of the doctrine of estoppel, by which one who has participated in the avails of a transaction which is incomplete, and cannot therefore bind creditors, shall not be heard to deny the transaction. And by the application of this doctrine the contract is not impugned, but is made effectual as against Marshall P. Ayers and John A. Ayers to the purposes intended by and expressed in it, to wit, the transfer of their interest in the debt, and in the supposed collateral, and to no greater extent. But how can the estoppel that rests upon the two conclude the firm of which they were members? The transaction had relation to the individual business of the two members of the firm, and was in no way related to the co-partnership business. We know of no principle in the law of estoppel by which the firm can be thus concluded. It is urged, however, that if the principle of estoppel cannot be applied here, since two of the co-partners had notice of William S. Hook’s claim to hold these 122 bonds as collateral to the syndicate debt, that was notice to the firm. The doctrine that a partnership is bound by notice to one of the partners results from the agency of the partner, and because of his duty to communicate his knowledge to his partners. But notice to a partner, to bind the co-partnership, must be with reference to a transaction within the scope of the co-partnership business, and not the knowledge derived by one co-partner in the transaction of his private business; for, in respect to private matters, there exists no duty upon one to communicate his information to his co-partners. Duncklee v. Mill Co., 23 N. H. 245; Bank v. Savery, 82 N. Y. 291. It is, however, said that Augustus E. Ayers had notice prior to the sale to William S. Hook of his intention to hold these bonds as security for advances which the syndicate might make to the Jacksonville Southeastern Company, and that with such knowledge he stood silent, not objecting, and therefore should be concluded. *984 There was no duty resting upon Augustus E. Ayers, as a creditor of the Jacksonville Southeastern Railway Company, to enter his objection to the carrying out of the intentions of William S. Hook with respect to these bonds. Whatever William S. Hook might do, he did at his peril. Owing him no duty in this regard, Augustus E. Ayers cannot be estopped by his silence. There is no evidence in this record that he knew of the sale by his partners of their interest in the syndicate, and, if he did, we are unable to perceive that such knowledge would conclude him with respect to any just claim of the firm as creditor of the Jacksonville Southeastern Railway Company. He did not actively consent to any appropriation of the bonds by William S. Hook. If, knowing of Hook’s claim to the bonds, he was silent when Hook dealt with his partners for their interest, that silence induced no action. He made no representation, he concealed no fact which he was bound to communicate to Hook; nor did the latter part with any valuable thing upon the faith of his silence. It may seem inequitable to permit a recovery by this firm, in view of the fact that two of its members received the money of William S. Hook when they knew that he claimed these bonds as security for the debt which he purchased. It might be possible—we do not, however, so decide—to recognize this equitable consideration, if we had before us evidence of the condition of the co-partnership, and the relative interests of the partners. The record, however, is silent upon that subject. We have no data upon which to work out the equity, if we were permitted so to do.
The decree under consideration would seem to be predicated upon an erroneous basis, because it recognizes the claim of the appellant, but subrogates her rights to those of the appellees. Our conclusion denies her right to the bonds in controversy, and asserts them to be the property of the railway company. In the distribution of the proceeds of the sale, these bonds should not share with those held by the appellees, because the latter are held as collateral to the debt of the company. The decree, however erroneous in theory, conforms to the prayer of the amended cross bill, and in that regard is favorable to the appellant, and cannot be impugned by her. It is not opposed by the appellees. The decree must therefore be affirmed.