BUSH et al. v. EXPORT STORAGE CO. et al.

(Circuit Court, E. D. Tennessee, S. D. August 11, 1904.)

No. 808.

1. BANKRUPTCY—PROPERTY PASSING TO TRUSTEE—PROPERTY TRANSFERRED IN FRAUD OF CREDITORS.

The title, which passes to the trustee of a bankrupt under Bankr. Act July 1, 1898, c. 541, § 70a (4), 30 Stat. 566 [U. S. Comp. St. 1901, p. 3451], to "property transferred by him in fraud of his creditors," is limited to such property as might have been recovered by creditors, in whose right the trustee takes, under the laws of the state, and as may be recovered by him under section 70e (30 Stat. 566 [U. S. Comp. St. 1901, p. 3452]), which expressly excludes property which passed into the hands of a bona fide holder for value prior to the date of the adjudication.

2. PLEDGE—CONSTRUCTIVE DELIVERY—WAREHOUSE RECEIPTS.

It is the settled law, by modern decisions, that, with respect to bulky articles or commodities, the delivery to a pledgee of a warehouse receipt

or bill of lading operates as a constructive delivery of the property, good against the world, and which will entitle the pledgee to recover actual possession.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Warehousemen, §§ 34, 37.]

3. SAME.

A corporation engaged in manufacturing railroad cars and equipment, and having an extensive plant, and premises adjacent for the storage of material, executed leases thereon to warehouse companies, by which it undertook to convey to them the right to use for warehouse purposes such part of the premises as was not used by the lessor. The part used for warehousing was in charge of a custodian selected by agreement, and acting on behalf of the warehouse companies, and was used for the storage of material purchased by the manufacturing company, for which the warehouse companies issued receipts used by the manufacturing company as collateral security for loans. It was contemplated by the arrangement that the warehouse companies would sufficiently mark off the premises used by them for storage by placarding or putting up signboards, and by suitably marking, by stakes, cards, and tags, the piles of material for which it had issued receipts. From time to time the manufacturing company used up such material as required in its business, but, until a very short time before its bankruptcy, such material was replaced by new purchases, so that at nearly all times the amount called for by outstanding receipts was on hand. *Held*, that the pledging of such warehouse receipts to banks, who took the same for value and in good faith, carried a valid title to the property covered thereby, or that had been substituted therefor, in the hands of the warehouse companies, as against the trustee in bankruptcy of the manufacturing company, and that the validity of the pledge was not affected by the fact that the warehouse premises were owned by the pledgor, and used by it, jointly with the warehouse companies, for different purposes.

4. SAME—RIGHTS OF PLEDGEE AS BONA FIDE PURCHASER.

While good faith does not make good a pledge unless there has been a delivery of possession, either actual or constructive, it is equally true that where a constructive delivery has been made by the delivery of warehouse receipts representing the property, which was then in possession of the warehouseman, and accepted for value and in good faith, the pledgee is a bona fide purchaser, whose rights cannot be affected by the methods of dealing between the pledgor and the warehouseman, by which a withdrawal of the pledged property, and the substitution of other property of the same kind, are permitted, without the pledgee's knowledge or consent.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Warehousemen, § 36.]

5. SAME—TITLE OF PLEDGOR—SALE OR BAILMENT.

By a contract for the building of railroad cars, the purchaser was given the option to furnish certain parts and equipment for the same, which the builder agreed to accept and pay for at the prices therein named. Such parts were shipped to the builder, and bills therefor were sent, charging it with the same at the contract prices; but, in practice, the price of the parts furnished was deducted from the price of each car when the same was delivered. On receipt of such parts by the builder, it delivered the same to a warehouse company, taking receipts therefor, which it pledged as collateral security for loans, and some of such receipts were outstanding in the hands of the pledgees at the time of its bankruptcy. *Held*, that the contract was plain and unambiguous, and could not be affected by previous negotiations or subsequent dealings between the parties, and shipments thereunder constituted sales, and not bailments of the parts shipped, and that the title to such property as remained in the hands of the warehouseman at the time of bankruptcy was in the pledgees.

In Equity.

Williams & Lancaster and John P. Tillman, for plaintiffs.

Granbery & Trabue, for defendant warehouse companies.

Laurence Maxwell, Jr., for receipt holders.

CLARK, District Judge. This bill is brought by trustees in bankruptcy to have certain warehouse receipts declared invalid and set aside, so far as they are made the basis of a claim to material found on the premises of the bankrupt at the time the bankruptcy proceedings were instituted.

It may be important in this case, in the very outset, to determine the right which the trustees are undertaking to assert and enforce in this case, and the sources from which the trustees derive the right and remedy.

Section 70a of the bankruptcy law (Act July 1, 1898, c. 541, 30 Stat. 566 [U. S. Comp. St. 1901, p. 3451]) provides:

"The trustee of the estate of a bankrupt, upon his appointment and qualification, * * * shall * * * be vested by operation of law with the title of the bankrupt, as of the date he was adjudged a bankrupt, * * * to all * * * (5) property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him."

The trustee, upon his appointment and qualification, is thus vested, by operation of law, without any deed of conveyance, with the title of the bankrupt, "as of the date he was adjudged a bankrupt." In re Engle (D. C.) 105 Fed. 893; Hewit v. Berlin Machine Works, 194 U. S. 302, 24 Sup. Ct. 690, 48 L. Ed. 986. In relation to a right or title thus derived by operation of law from the bankrupt himself, it is very true, and is well settled, that the trustee takes just such title as the bankrupt had, and no better or greater title, and subject to estoppel and to all liens or equities to which the title was subject in the hands of the bankrupt. Loveland on Bankruptcy (2d Ed.) pp. 367, 368; Hewit v. Berlin Machine Works, supra.

But this proposition, although well settled, does not meet or dispose of the contention here presented, for the right which is asserted by the trustees in the present suit was not derived by operation of law from the bankrupt, and the remedy being pursued is not one which was available to the bankrupt. The right here asserted, and the remedy adopted to enforce that right, passed, by operation of law, not from the bankrupt itself, but from creditors of the bankrupt; and the trustees are undertaking to enforce the right in the interest of the creditors of the bankrupt, and in their right, and not by virtue of any right or remedy which passed, by operation of law, from the bankrupt. And so this suit does not involve those provisions of the bankruptcy statute which vest in the trustee the right to avoid certain defined transfers declared invalid by the bankruptcy act itself, and to recover the property fraudulently conveyed. Transfers which are deemed fraudulent, in bankruptcy, and so declared by the bankruptcy act itself, are, first, conveyances and transfers by which a creditor obtains a preference of his claim over other creditors; second, conveyances which are intended to hinder and delay or defraud creditors; and, third (section 67e, cl.

3, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449]), transfers void as to creditors under the local law of the several states; but these transfers are prohibited, and authority vested in the trustee to set them aside, only when made within the four-months limitation.

But besides this class of transfers made void by the bankrupt act itself, as being against its policy of equal and fair distribution, the bankruptcy law (section 70a, subsec. 4, 30 Stat. 566), provides that the trustee shall be vested by operation of law with any property transferred by the bankrupt in fraud of his creditors, the precise language of the act being, "transferred by him in fraud of his creditors." There is no four-months limitation on this class of transfers, and this provision includes fraudulent conveyances which are so by the common law, by statute law, and by any other recognized rule of law of the state. Loveland on Bankruptcy (2d Ed.) § 158, and cases cited. Of course, the fraudulent bankrupt is without right to set aside a conveyance made by him in fraud of his creditors. It is valid between the parties, but, by operation of the very terms of the act, the right which before bankruptcy belonged to the creditors passes from them, and is vested in the trustee.

Fraud, actual or constructive, is a necessary element to give the trustee in bankruptcy a right of action; and the trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a bona fide holder for value prior to the date of adjudication.

The language of section 70e (30 Stat. 566 [U. S. Comp. St. 1901, p. 3452]) is as follows:

"The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a bona fide holder for value prior to the date of adjudication. Such property may be recovered or its value collected from whoever may have received it, except a bona fide holder for value."

It is quite obvious enough that the bankruptcy statute has vested in the trustee this comprehensive power to set aside, in favor of creditors, conveyances which the creditors of the bankrupt might have avoided, subject to the qualification or limitation found in section 70e, which provides, in terms, that the trustee "may recover the property so transferred, or its value, from the person to whom it was transferred, *unless he was a bona fide holder for value* prior to the date of adjudication. Such property may be recovered or its value collected from whoever may have received it, *except a bona fide holder for value."* (Italics mine.) Loveland on Bankruptcy (2d Ed.) § 158; Crooks v. Stuart (C. C.) 7 Fed. 800; Trimble v. Woodhead, 102 U. S. 647, 26 L. Ed. 290.

It seems open to the trustee, under the above statute, to follow the property fraudulently conveyed, or the proceeds of such property, into the hands of whoever may have received it, until a bona fide purchaser is reached, and that the statute makes this a limit, beyond which the trustee may not go, as the bankruptcy act in this respect re-enacts the exception found in the English statute against fraudulent conveyances

(13 Eliz. c. 5). In re Mullen (D. C.) 101 Fed. 413, at page 416; Lansing Boiler & E. Works v. Joseph T. Ryerson & Son, 128 Fed. 701, 63 C. C. A. 253; Loveland on Bankruptcy (2d Ed.) § 158, and cases cited.

It may be affirmed to be true, as a general proposition, that under any state system of jurisprudence it is necessary, in order to set aside a conveyance or transfer of property as fraudulent against creditors, that the fraud must have been participated in by the vendee or purchaser as well as the vendor. If there are some exceptions, or apparent exceptions, they are not important. This rule that, to render a transfer or conveyance fraudulent as to creditors, it is necessary that the transferee or vendee should have participated in the fraud,. is the law both of Tennessee and Alabama. But however this may be, as I have just said, the creditor's right is passed to and vested in the trustee by operation of the bankruptcy law, subject to the limitation that the right of a bona fide purchaser or holder must not be disturbed or divested. The purpose to guard the rights of a bona fide purchaser or holder is everywhere manifested on the face of the bankruptcy act, as amended by the act of 1903. This protection of the rights of a bona fide purchaser is necessary in order to uphold sound commercial policy and confidence, and to avoid inflicting upon the innocent the unnecessary and harsh disadvantage of frequent and serious loss. The right which the trustee may enforce in a suit like this is such right as the creditor would have had in regard to the same transaction as it stood at the time of filing the petition in bankruptcy, and prior thereto, and is subject to the limitation found in the common law, and expressly declared in the bankruptcy act—that the transfer may not be set aside, and the property or its value recovered from an innocent purchaser or holder. This is manifestly the doctrine under which the present bill is proceeding and must proceed, and under which the result must be determined.

These preliminary observations have seemed necessary in order to clear away some confusion as to the ground on which the trustee is standing in the assertion of the right here presented, and the remedy which is being pursued under express authority of the bankruptcy statute.

I do not conceive that section 70, subsec. 5, is materially in point in regard to any question here to be considered or decided. That section is concerned only with furnishing a definition and prescribing a test to determine what property shall pass by operation of law from the bankrupt to the trustee, so as to become a part of the estate for administration and distribution among the creditors. Its purpose is to distinguish between what passes and what does not pass, as regards specific property and property rights, without regard to the condition of the property—whether in possession or in action. With reference to its condition, the property might be found in adverse possession of a third person, or to have been fraudulently transferred, or under an invalid pledge or lien, in all of which cases suit by the trustee would or might become necessary in order to bring in the property or its proceeds, but these several conditions were provided for elsewhere and in other sections of the act; and it was provided in subsection 4, immediately preceding subsection 5, that prop-

erty transferred by the bankrupt in fraud of his creditors should pass to the trustee; and section 70e also authorizes the trustee to sue for the property or its value.

Coming back to the test prescribed by subsection 5, it is provided that whatever property was transferable by the bankrupt, or which might have been levied upon and sold under judicial process against the bankrupt, passes to the trustee. This is the whole scope and purpose of subsection 5. For example, exempt property would not pass. A right of dower by a wife is no part of the property, and would not pass to her trustee, and an estate by curtesy in a wife's property does not pass to the trustee of her husband during her lifetime. The effect of this clause is to transfer the greater part of the assets of the bankrupt, and it has been held that a contingent interest in an estate in remainder, and the income of a life estate under a will, or Indian lands under an allotment act of Congress, do not pass. There would have been no reason or motive in Congress, if the power existed, to enact that property or property rights of the bankrupt which were not in any manner transferable or leviable at law should go to the trustee, and constitute a part of his estate for distribution among the creditors, because such property would not be subject to judicial process if bankruptcy had never taken place. Other sections of the bankruptcy act, as clause 4 of section 70 and section 70e, deal with the case of property fraudulently transferred or disposed of under such circumstances as that creditors might have set aside the transaction if bankruptcy had not occurred. These observations seem sufficient to show that the issues here presented for determination do not in any wise arise under clause 5, and do not call for its interpretation or application.

Subsection 4 of section 70 and section 70e may be read in connection with section 1, subsecs. 23 and 25 (30 Stat. 544, 545 [U. S. Comp. St. 1901, p. 3420]). Collier on Bankruptcy (4th Ed.) p. 510; Loveland on Bankruptcy (2d Ed.) pp. 381, 382, 384, and, in regard to clause 5, pp. 394–408. See, also, Brandenburg on Bankruptcy (3d Ed.) § 1146, and particularly sections 1148 and 1152.

Furthermore, such property as the trustee takes under clause 5 of section 70, and whether he takes it in possession or in action, is taken in the "same plight and condition" as it was in the hands of the bankrupt, and affected by any lien or equity by which it would have been affected in the possession of the bankrupt if bankruptcy had not occurred. It is hardly to be doubted that this is so, and that the rule in Yeatman v. Savings Institution, 95 U. S. 764, 24 L. Ed. 589, would apply; and, indeed, this must be regarded as expressly so decided in the late case of Hewit v. Berlin Machine Works, 194 U. S. 302, 24 Sup. Ct. 690, 48 L. Ed. 986, in which subsection 5 was under consideration. When, however, the trustee is proceeding to assert rights which passed to and became vested in him under the bankruptcy act, not from the bankrupt himself, but from creditors, and as the representative of creditors, under section 70, cl. 4, and section 70e, different considerations and different rules apply, and he may then assert any right which the creditor might have asserted on the facts as they were at the time of the filing of the petition in bank-

ruptcy; and the trustee may impeach or set aside any act or transaction of the bankrupt, and recover property or its proceeds, just as creditors might have done if bankruptcy had not occurred, and the rights and remedies of the creditors had not been vested in the trustee.

While other sections may be profitably read and studied in connection with section 70, cl. 4, and section 70e, we are, in a case like the one at bar, dealing with a creditor's right under the law of the state as it existed before the filing of the petition or adjudication, and which creditor's right vested in the trustee by operation of the bankruptcy act, to be enforced as the representative of creditors; and, as we have seen, the bankruptcy law adopts the law of the state as defining and determining the rights of the creditors. It is quite clear, therefore, that we are mainly and specially concerned with section 70, cl. 4, and with section 70e, under which the law of the state is to furnish the rule of decision, and the bankruptcy act itself, in section 1, subsec. 25, furnishes a definition of such transfers as may be set aside; the act declaring in that regard that:

"'Transfer' shall include the sale and every other and different mode of disposing of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift or security."

So, also, I do not think that section 67a is applicable to the contention here, but is limited to transfers invalid under the bankruptcy law itself, when made within the four-months limitation.

The claims made by the defendant banks are not under chattel mortgages, or any other instruments which under the law of Tennessee are invalid for want of registration; and, if their claims can be sustained either as pledges or as equitable liens, they are claims which, under the law of Tennessee, are not required to be recorded, and the want of recordation would not invalidate or affect them. The registration of such a claim would not sustain it, and the failure to do so would not defeat it, under the law of the state. Ex parte Fitz, 2 Lowell (U. S.) 519, Fed. Cas. No. 4,837; Arendale v. Morgan & Co., 5 Sneed, 703.

And these remarks lead us up to the question whether or not the warehouse receipts in question in this case were legally sufficient to constitute a valid pledge or equitable lien on the property claimed under these warehouse receipts, and which property it is the object of the present bill to recover, and for that purpose to have the warehouse receipts set aside and declared invalid, and this contention may now be taken up.

The leading facts in connection with these warehouse receipts, and the methods under which they were issued, and the course of dealing with the property subsequent to the issuance of the warehouse receipts, are not, as I think, in serious dispute, and are not facts about which there is any serious question in the evidence. Certainly this may be affirmed to be true in regard to the substantial and important facts found in the record. The relation between the bankrupt car company and the warehouse companies issuing these warehouse receipts at the time the receipts were issued and subsequently will appear by a very brief statement of the facts, and these facts will be

sufficiently suggestive of the system under which it was attempted to carry on the business. The bankrupt company was engaged in the business of manufacturing and selling railway cars and equipment, and for that purpose owned large plants and premises on which to operate and maintain the machinery necessary in such a manufacturing establishment, with large adjacent premises on which to store and place a large accumulation of material, which it was necessary to keep constantly on hand in conducting such a business. By a system of leasing, the bankrupt company undertook to confer upon the warehousing companies the right, by lease, to use any or all of that part of its premises commonly set apart for storing material as a warehouse yard for the purpose of conducting a warehouse business. The effect of the contracts was to vest in each party certain rights in the premises. In the bankrupt company was the right and possession, so far as necessary and proper, for the operation of its machinery and for taking in material and transporting out manufactured products. In the warehouse companies was vested the right to the use of the premises not so needed by the manufacturing company, for the purpose of placing thereon, as a warehousing place, the material in its various form, such as would be required from day to day and from time to time by the bankrupt company in the operation of its manufacturing establishment. The use made of the premises might be said to be joint, for the purposes of each party, or exclusively to each party, so far as its business required, if we speak of the theoretical or abstract right established by these contracts of lease. In point of fact, there was no fence or inclosure around the parts or portions of the premises used for warehousing purposes, which separated them from those parts of the premises occupied by the building and machinery of the manufacturing company, and in the necessary operation of the manufacturing plant in all of its details. Under the system adopted, it was contemplated that the warehousing companies would sufficiently mark off the premises which were to be used by them for warehouse or storage purposes, by a system of placarding, or of putting up signboards, with such letters and characters as would indicate those used for storage purposes; and when, in the course of business, material was placed upon the premises, and a warehouse receipt issued therefor, the material, generally in bulk, along with or close by other material, was to be distinguished by stakes, cards, and tags; and a record of the different shipments and lots of material piled or stacked upon the premises was supposed to be kept at the office of the warehouse custodian, who was a person selected by agreement for the purpose of representing the warehouse companies in the matter of carrying on and looking after the warehouse portion of the premises, and the material stacked or stored upon such premises. Between the system of placarding and tagging, with the office records kept by the warehouse custodian, it was supposed that any person interested to inquire, or prosecuting an inquiry with reasonable diligence and intelligence, could ascertain the fact that certain material was on the warehouse premises, and in the possession or under the control of companies other than the manufacturing company, and that the ma-

terial covered at any time by any outstanding warehouse receipts could be ascertained by this system of tagging and marking, together with the records kept in the office of the warehouse custodian, constantly on the premises.

It is not to be doubted that the system was irregularly maintained in some of its details, if, indeed, it was at any time entirely perfect, and that there were slipshod methods that finally entered into the system of warehouse keeping which was actually undertaken to be maintained on these premises. While this is so, the evidence abundantly establishes that there was at no time a warehouse receipt issued, except when the property called for by that warehouse receipt was upon the premises, and by agreement in possession of the warehouse custodian, and that there was sufficient effort on the part of the warehouse custodian at all times to keep an amount of material and supplies in stacks and in piles on the warehouse premises of the kind, value, and quantity called for by any and by all of the warehouse receipts outstanding at any given time, and, if at any time the material appeared to be running below this limit, demand was made that the deficiency should be made good, which was done; and this system continued down until a very short time before these bankruptcy proceedings were instituted, when, for a short while prior thereto—at least two or three weeks—there was suffered to occur a shortage in the kind, quantity, and value of the material necessary to answer the claims of all the outstanding warehouse receipts.

It is not disputed that the warehousing system would be good if properly and carefully maintained in its essential details. The objection is that the system, in its essential details, calculated to furnish reasonable safeguards, and to give notice of the real condition of affairs as they at any time existed, was disregarded. This contention on behalf of plaintiffs is thus stated by one of plaintiffs' eminent counsel:

"Suffice it to say that had that 'paper system' been their actual system, this cause would not be before this court for adjudication, nor would these trustees be the representatives here of more than a million dollars of general creditors, but for the fraud of the 'actual system' by which alone was made possible the false credit obtained by the bankrupt."

It is conceded, and could not be controverted, that the creditor banks now holding these warehouse receipts took the same in good faith, and without any knowledge, and in the absence of facts which would put them upon inquiry, as to any failure or slipshod methods in regard to carrying out the full details of the system of warehousing, as described and defined by the evidence and papers found in this record.

In its last analysis, the contention here is not so much over the system of warehousing theoretically adopted and theoretically followed by these warehousing companies, and its sufficiency in law to constitute a pledge, as over the disregard shown in respect of the details of that system on the part of the warehousing companies, and the warehouse custodian, their representative on the ground, as well as certain inspectors who made trips in behalf of the warehousing companies to these premises from time to time for the purpose of

looking after the business, and charged with the duty of maintaining the system theoretically adopted in all of its details.

The contention is that the placarding was insufficient to mark or point out the premises, or to give notice to the public that any particular parts of the premises were occupied for warehousing purposes, or that any of the premises was so occupied, and that the system of tagging and marking the property covered by any warehouse receipt was insufficient to identify the same. It is insisted that the warehousing premises were not marked off by any sufficiently defined boundaries, by stakes, placards, fences, gates, signboards, or otherwise, to show and maintain the exclusive possession of the warehousing companies. The argument is that there was no warehouse at all, and that the very foundation on which a valid warehouse receipt could be issued is thus wanting. The further contention is that there was no exclusive possession of the premises, and that there was and could be no exclusive possession of the property delivered, so as to constitute a pledge, and that, if delivered, the property was not so separated or marked that the material on hand at the time of issuing any warehouse receipt therefor could now be identified, as the evidence discloses that from time to time the manufacturing company used up this material as the operation of its factory and the demands of its business might require, and that other material was substituted from time to time, and frequently, so that it cannot now be said that very little, if any, of the original material covered by the warehouse receipts is on hand, or was at the time of the beginning of the bankruptcy proceedings.

This is the contention in respect of the facts given in brief outline, and a discussion in detail of the evidence would extend this opinion beyond all reasonable limits, and does not seem to be called for in pronouncing what the court regards as a proper judgment in the case. and giving briefly and chiefly, in respect of questions of law, the grounds on which the judgment proceeds.

It is not to be disputed that the earlier cases on the subject declare a very strict doctrine in regard to the questions of actual delivery, segregation, and exclusive possession, as necessary conditions in constituting a valid pledge, but a study of more recent cases discloses what is always recognized—that the law itself, in order to meet the requirements of commerce and our constantly changing industrial and commercial conditions, is progressive and expansive, and constantly, by slow changes, adapting itself to the changed conditions due to progress, and in this way the earlier and more stringent rules are constantly being liberalized and somewhat relaxed. It is now well established, for example, that, in determining the sufficiency of delivery in a pledge, it is necessary to consider the nature of the property, the surrounding circumstances, and the objects of the pledge, and the reasonable convenience of the pledgor and pledgee, and the apparent demands of larger aggregations of capital and large operations in business. It is settled that there need not in all cases be an actual moving of property, but only such a delivery as the property is reasonably capable of, and as is reasonably suitable under the circumstances. In the case of property of much weight or bulk,

moved or transferred with difficulty and expense, a symbolical or constructive delivery has become the rule in almost all cases, instead of an actual delivery; and for much the same reasons the strict necessity of segregation is slowly disappearing, and the validity of substitution is very well settled. It is well settled that, where property is stored in a warehouse, the owner may pledge it by transferring to the pledgee the warehouse receipts—this being a symbolical delivery of the property—and it will give the pledgee such special property in the goods as will entitle him to recover possession. The same doctrine is applicable to bills of lading as ordinarily made out, with notes or drafts attached, and discounted at banking institutions. The cases on this subject are many, and need not be cited, but in this connection reference may be made to the following cases: Means v. Bank of Randall, 146 U. S. 620, 13 Sup. 'Ct. 186, 36 L. Ed. 1107; Clark v. Iselin, 21 Wall. 360, 22 L. Ed. 568; Stewart, Gwynne & Co. v. Insurance Co., 9 Lea, 104; Cornick v. Richards, 3 Lea, 1; Price v. Wisconsin M. & F. Ins. Co., 43 Wis. 267; Bank of Rome v. Haselton, 15 Lea, 242. Other and many cases will be found collated in 22 A. & E. Encycl. of L. (2d Ed.) p. 858.

It may be of service to refer briefly to some of the leading cases:

In the leading case of Blydenstein v. New York Security & Trust Company, 15 C. C. A. 14, 67 Fed. 469, a system of doing business was adopted by which the warehouse issued what was called "open receipts" for certain specified quantities of burlap, without specifying any particular bales, and kept against such open receipts those bales which had been longest in store, and delivering to the pledgor's order the oldest bales, and substituting for such bales later bales under the open receipts, but keeping on hand always a sufficient quantity to cover the outstanding open receipts, under which the holders could at any time call for the quantity specified in the receipts from the warehouse; and in such a system substitutions were constantly going on, and the holders of the outstanding warehouse receipts were not able at any time to call for the burlap bales originally covered by the warehouse receipts, but, as the quantity was kept up, they could at any time call for burlap bales of like number, quantity, and quality. It was held that the pledge of the open receipts as security gave the pledgee a valid lien on the bales then in store; that the release of older bales from time to time constituted a valuable consideration for subjecting the new bales, as they were deposited from time to time, to the same lien; and that the transaction was not unlawful, and was in all respects valid, and the pledge good.

This same system of warehousing was brought in question in the subsequent case of New York Security & Trust Co. v. Lipman, 91 Hun (N. Y.) 554, 36 N. Y. Supp. 355, and the subject re-examined at length, and the Blydenstein Case followed and approved; the Supreme Court (now the Appellate Division of the Supreme Court) holding that it was competent for Lipman & Co. and the warehouse company to make an agreement by which receipts were to be issued without bale marks, so that other bales could be substituted for those in pledge; that such an agreement as this violated no statute, and was not against public policy, and was valid. It was, of course, held

and necessarily implied in such a decision that the transfer of the warehouse receipts carried title to the property, and created a valid lien upon the property—not only the bales of burlap originally in possession when the pledge was made, but upon the new bales subsequently substituted and finally found on the premises—and that the plaintiff in that case, as pledgee, was, as to the bales stored in substitution of the older ones, a holder for value, in the usual course of business. The opinion was by Parker, J., then one of the Judges of the General Term of the Supreme Court, now Chief Judge of the Court of Appeals. Referring to this contract and system of dealing, under which the property was not segregated by marks or distinguishing brands, but was an open receipt, according to the understanding, and subject to the constant substitution of new for older bales, the learned judge said:

"Lipman & Co., in accordance with the usual custom in such cases, and their agreement with the warehouse company, continued thereafter to deposit bales of burlap in the warehouse as they were received from time to time and to sell burlap which was stored, and to call for deliveries to their purchasers, the oldest bales being always held for delivery on the open receipts, and, when they were delivered, the next oldest bales were substituted. Thus the bales which were on hand at the time the warehouse receipts in question were given, were after a time all disposed of by this process of substitution, new bales being put in the place of the old as fast as they were taken out, so that there was always in the possession of the warehouse company a sufficient number of bales to make good the agreement which the warehouse company expressed in its receipts. The arrangement which Lipman & Co. had with the warehouse company made it possible to take out the old bales from the warehouse, and put in new ones, without the necessity of making new receipts every time there was a sale. Such was the agreement, and of its validity there seems to be no doubt. No statute was violated, nor is any reason apparent for deeming it against public policy for a bailee to agree with his bailor that, if he [the bailor] shall at any time have on storage a greater amount of goods of the same kind and quality, he may substitute the surplus for a like quantity of that which was originally pledged. It was precisely that which the Terminal Warehouse Company and Lipman & Co. agreed should be done, and it was that which they did in fact. Bales of burlap were never delivered upon the order of Lipman & Co., unless there were present in the warehouse other bales, apparently the property of Lipman & Co., to substitute in their place. By this process of substitution it so happened, in the course of time, that the entire 801 bales which were in the warehouse on the 1st day of December, 1891, were delivered to persons to whom they had been sold by Lipman & Co., and other bales stored in the warehouse were substituted in their place and stead."

This case was on appeal affirmed by the Court of Appeals of New York. New York Security & Trust Co. v. Lipman & Co., 157 N. Y. 551, 52 N. E. 595. The Court of Appeals of New York, referring to the case of Blydenstein v. New York Security & Trust Co., 15 C. C. A., 14, 67 Fed. 469, said:

"We close our review by quoting from that opinion as follows: 'The trust company, therefore, on September 7, 1892, obtained a valid lien on 500 bales of Lipman & Co.'s burlap then stored in the warehouse. Thereupon the warehouse company became its bailee, and held the bales for it. Gibson v. Stevens, 8 How. (U. S.) 384 [12 L. Ed. 1123]. Whenever thereafter Lipman & Co. asked to substitute other similar goods of their own for those originally delivered as collateral, the surrender of an equal quantity of the original security of equal value would be a valuable consideration for the giving of the

new security. The pledgee as to the latter would be a holder for value, and the exchange would have no effect upon the rights of the pledgee as founded upon the original contract. Colebrooks on Col. § 15; Clark v. Iselin, 21 Wall. 360 [22 L. Ed. 568].' "

In the case of National Exchange Bank of Hartford v. Wilder, 34 Minn. 149, 24 N. W. 699, the rule was recognized and declared that possession by the pledgee was necessary to the existence and continuance of a pledge. It was held, however, that such possession need not be actual physical possession. The delivery of a recognized symbol of title, such as a warehouse receipt, which puts the pledgee in control and constructive possession of the property, was declared to be sufficient. It was further held that where the property was part of a large, uniform mass, like wheat in an elevator, separation was not necessary to constitute an appropriation by the contract of pledge, and that a warehouse receipt was equivalent to an actual transfer of the possession, and rendered the warehouseman bailee of the pledgee. The opinion in this case is instructive and reviews the authorities.

In the case of Hoffman et al. v. Schoyer et al., 143 Ill. 598, 28 N. E. 823, the warehouse receipts called in question were issued without showing on their face the brands or distinguishing marks of the property stored, notwithstanding a statute of the state of Illinois required that the warehouse receipts should distinctly state on their face the brands or marks upon such property. The receipts were nevertheless held good in the hands of an assignee for value. It was further declared that the holders of such receipts had a specific lien as against the party storing the property, notwithstanding the property covered by the receipts was mingled in a common mass with such other property, and that most of it had been removed from the warehouse and disposed of after issuance of the receipts, and other property substituted in its place. The transactions were, of course, good on the ground of estoppel as against the owner or pledgor; and it was held that the lien created by the warehouse receipts was not lost by the appointment of a receiver, and was good against the firm creditors. The case is distinguishable from the one at bar in the fact that the creditors in that case were partnership creditors, under the necessity of working out any equity they might have through the partnership, while in this case the general creditor is not limited by that view, and may assert all the rights belonging to a general creditor of an individual.

In the case of Citizens' Banking Co. v. Peacock & Carr, 103 Ga. 171, 29 S. E. 752, it was held that, to create a pledge or pawn, it is necessary that the property pledged shall be delivered into the possession of the pledgee, but delivery may be either actual or constructive, and when warehouse receipts for cotton are given in pledge the effect is to deliver the cotton itself.

In the case of Alabama State Bank v. Barnes, 82 Ala. 607, 2 South. 349, it was decided that, in the absence of statute regulation, the delivery of a warehouse receipt, payable to bearer, as collateral security, without indorsement, placed the legal title and vested the possession of the property in the pledgee, as if there had been an actual manual

delivery, and that a transfer by mere delivery passed a special property and a constructive possession, and that this possession was sufficient to create a valid pledge between the parties, and as against third persons who had not acquired prior or intervening rights.

In the case of American Pig Iron Storage Warrant Co. v. German, Ex'x, et al., 126 Ala. 194, 28 South. 603, 85 Am. St. Rep. 21, it was said that possession of the property pledged, and good faith on the part of the pledgee, are both necessary to constitute a valid pledge as against the rights of the creditors of the pledgor, but that statutes requiring mortgages of personal property to be in writing were without application. It was also held that possession must be complete, unequivocal, or exclusive of the pledgor's possession in his own right. It was declared to be unnecessary, however, in order to give validity to the pledge, that delivery of the property should be made at the very time of the contract, but that the property might be subsequently delivered, and that the pledge would become valid and take effect upon such delivery in performance of the contract. It was further adjudged that in case of pledge of tons of iron under an agreement of pledge, on a spot of ground belonging to the pledgor (a furnace company), but located apart from its other ironyards, and tons of iron pledged placed upon such spot of ground, and marked with paint with the pledgee's initials, this was sufficient delivery of possession of the iron, and gave sufficient public notice of the pledgee's interest in the iron. It was furthermore ruled that the subsequent wrongful removal of the iron so delivered, without the consent or ratification of the pledgee, could not defeat the pledgee's right, upon maturity of the debt, to have such iron subjected to the payment of the debt, and this notwithstanding the iron removed was transferred to a bona fide vendee.

In this state (Tennessee) it was declared as early as the case of Julius Ochs et al. v. Burger, and F. Seibel v. W. G. Price et al., 6 Heisk. 483, that a transfer and delivery of a bill of lading is, in law, a delivery of the property, and vests title in the transferee; such a delivery being constructively sufficient.

In Stewart, Gwynn & Co. v. Insurance Co., already cited, it was declared, in accordance with the doctrine of the modern cases, that warehouse receipts are considered representatives of property, and that an assignment of the receipt is equivalent to a delivery of the property, and that such receipts are contracts.

In the case of Ex parte Fitz, 9 Fed. Cas. 185, 2 Lowell, 519, it was ruled by Judge Lowell, of Massachusetts, that a bill of sale intended for security operated as a pledge, and that delivery to the pledgee might be either actual or constructive, and, again, that possession might be kept by an agent, and that such agent might be the pledgor.

In Dunn v. Train, 125 Fed. 221, 60 C. C. A. 113, the agreement was that a paper company should deliver the product of its mill to selling agents as security for advances which were made to it by the plaintiff, and deliveries were made, as the goods were manufactured, to an agent agreed upon, who was also an employé of the manufacturing company, and the product was placed by itself on the premises of the company, and was thereafter controlled by its agent, who

shipped from time to time as the plaintiff might order. It was ruled that there was both actual delivery and continuous possession, such as rendered the pledge valid against an assignee of the company, with respect to the goods on hand when the assignee was appointed.

Aldrich, District Judge, giving the opinion of the Circuit Court of Appeals, said:

"We are not aware of any absolute rule of law which would render actual possession and dominion inoperative, and a pledge invalid, because the keeper selected to protect the property was in the employ of the pledgor. Such a bailee or keeper was in the employ of the manufacturers in Sumner v. Hamlet, 12 Pick. 76; and even—as said in Casey v. Cavaroc, 96 U. S. 467, 24 L. Ed. 779—temporary possession may be in the pledgor himself, as special bailee, without defeating the legal possession of the pledgee. Neither is there any absolute rule of law that, where one keeper succeeds another, formal delivery shall be made to the successor. Of course, enough should be done to identify the property, and to show that dominion and control over the property were assumed by the successor; and this sufficiently appears, for the learned judge below has said that the pile being left where it was and as it was, the successor added to this pile the product as it was delivered to him. Nor is there any absolute rule of law which requires property pledged to be removed from the premises of the pledgor. It is enough if the facts sufficiently show that the goods are actually set apart in the keeping of the special bailee, with authority to notify third persons that they are held in pledge, and to remove the goods, if found necessary for the safety of his principal."

In support of the proposition, now well settled in the adjudged cases, that the pledgor himself may be agent of the pledgee for possession and custody, see, also, McCready & Co. v. Haslock, 3 Tenn. Ch. 13.

In Ayers v. McCandless, 147 Pa. 49, 23 Atl. 344, it was held that a change of location was not in all cases necessary to constitute a valid delivery of a chattel as against creditors of the vendor. As was said by the court, "Due regard must be had to the character of the property, the nature of the transaction, the position of the parties, and the intended use of the property." In that case a lot of lumber piled on the millyard of the vendors was marked on each pile in such a manner as to be visible to one examining the lumber as an intending purchaser. A bill was given, reciting this fact, and agreeing that the vendors were to deliver up possession of the lumber, and to hold it in their yard and mill subject to the order of vendee. This was held sufficient as against an execution creditor of the vendors.

In Sumner v. Hamlet, 12 Pick. 76, it was held that, in order to maintain a valid lien as against an attachment subsequently made on goods, it was not necessary that the goods should be removed from the premises of the pledgors, and that it was sufficient if they were in the custody of a special bailee, agreed upon, for the purpose of holding possession, although such bailee was at the time an employé of the pledgors. It was declared to be sufficient if such special bailee was authorized to give notice of the lien to any purchaser or attaching creditor, and also to remove the goods, if removal should become necessary for the safety of his principal.

In a work of high authority the result of the more recently adjudged cases is thus laid down:

"Delivery, in order to be effectual against the world, should be followed by an acceptance of possession, and methods of delivery and acceptance dif-

fer according to the subject-matter and the local situation of the thing. For corporeal chattels in possession there should be usually a delivery of those chattels to the pledgee at once. But constructive delivery and acceptance are now much favored in such transactions. The transfer of the bill of lading of a ship at sea, or the delivery of a warehouse key, have long been esteemed sufficient for legally transferring possession of the thing so symbolized. And so, in modern times, one's pledge by delivering bills of lading of goods in transit, or waybills, whether inland or by water, usually suffices to make the pledgee's title good against the world. Warehouse receipts and the receipts of wharfingers or other hired custodians are also, when expressed in a negotiable form, permitted, in a variety of instances, to be turned over by way of a symbolical delivery of the goods on storage which they represent. Even the delivery of such muniments without a formal indorsement or assignment has, in deference to mutual intent and the loose usages of business, been frequently upheld as constructively sufficient, at all events between the parties themselves.

"Advances are constantly made on the security of merchandise in the course of trade at the present day, and it is quite customary of late years for the consignee of goods which are in transit to pass his bills of lading over to some bank or capitalist by way of security for the discount of his paper. Such transfers are firmly sustained by American courts as amounting to a pledge of the goods themselves for the pledgor's paper indebtedness, and, whether the transit were by land or sea, valid, on the score of a constructive delivery, as against both the pledgee and the public. The exercise of further dominion over the goods by such a pledgor, without his pledgee's assent, is held to confer upon a third party only a tortious possession, such as cannot prevent the pledgee from recovering them." Schouler on Bailments (3d Ed.) §§ 189, 190.

See, also, to the same effect, the following cases: Marine Bank v. Fiske et al., 71 N. Y. 353; Dows v. National Exchange Bank, 91 U. S. 618, 23 L. Ed. 214; Munroe v. Philadelphia Warehouse Co. (C. C.) 75 Fed. 545; American National Bank v. Henderson, 123 Ala. 612, 26 South. 498, 82 Am. St. Rep. 147; Cornick v. Richards, 3 Lea, 1; Cherry v. Frost, 7 Lea, 1; Bank of Rome v. Haselton, 15 Lea, 242; Fidelity Insurance, Trust & S. D. Co. v. Roanoke Iron Co. (C. C.) 81 Fed. 439.

The cases thus referred to are regarded as sufficiently showing the trend of the modern cases, without extending this review to other cases which might be cited.

In view of the doctrine as now established by the decided weight of authority, I conclude that there was a sufficient and valid delivery of possession, in the methods adopted in regard to the warehouse receipts in question.

There is no statute of this state or of Alabama which defines or requires any particular kind of warehouse. In regard to such heavy and bulky material as iron and other similar products used in a manufacturing establishment like the one in question, it would seem to be quite unreasonable to require that it should be stored or kept in any particular kind of building or warehouse, such as would be necessary for the storage of grain, meats, and the like. Such a requirement would render a warehousing system for such material and articles extremely difficult and expensive. In the absence of statutory regulation, I conclude that leased premises like these in question, sufficiently marked off, by placards, stakes, or otherwise, to indicate possession, is valid, in law, as a warehouse lot or storage place, and that such a place is suitable and appropriate to heavy and bulky

material of the kind in question, and that the premises were sufficiently marked, so far as the issues now to be decided are concerned.

There would seem to be no serious difficulty, as matter of law, in treating the lessor and lessee as both in the actual possession of the premises, so far as the particular business and objects of possession on the part of each might require. It is not perceived that there is any conflict in such a possession, or that the agreement contravenes public policy, and it is not insisted that it is in violation of any statute.

In the absence of fraud, the issuance of the warehouse receipts in question, based on receiving warrants for material at the time on the premises and under the control of a custodian selected by agreement, was a valid and sufficient constructive delivery. In dealing with the situation, it is to be kept in mind that constructive possession is, as matter of law, at any time in the person entitled to such possession, in the absence of an actual adverse possession. In other words, constructive possession follows the right and the title, in the absence of a hostile possession and control. It is very true, as plaintiffs' able counsel has so clearly said, that "good faith does not make good a pledge, unless there has been a delivery of possession, either actual or constructive." This proposition, although too plainly evident for denial, was brought out and restated in the case of Hook v. Ayers, 80 Fed. 978, 26 C. C. A. 287. Delivery of possession, either actual or constructive, and acceptance, are facts which lie at the very foundation of the contention on behalf of the defendant banks, as innocent holders. Such possession and acceptance are the essential elements constituting the pledge, and the pledge is the foundation on which the defense of innocent holders is based. In the absence of such transfer of possession as would constitute a pledge, the position of innocent holder or purchaser could not exist. On the contrary, it is equally true that, if these warehouse receipts had their origin in a valid pledge, they passed to the defendant banks as innocent holders, as symbolic representatives of property, and their defense as assignees for value in good faith is a complete answer to every other objection urged in support of this bill. Their defense as assignees for value in good faith is good against every other ground on which this suit rests. And nothing in the dealings or methods between the pledgor and warehouse companies as bailees before or subsequent to a valid pledge of property which once passed into the hands of an innocent holder could affect or destroy the rights of such holders.

Assuming, as I have just said, that the issuance of warehouse receipts, in their inception, was on property at the time on the premises and under the control of the warehousing companies, through a custodian selected by agreement to hold possession, the subsequent interference with or interruption of that possession by substitution or otherwise would not divest or defeat the rights of the assignees for value, in the absence of knowledge or consent on their part. There would, as to them, and as matter of law, remain continued possession, for the reason that without their knowledge or consent there could be no legally valid change of possession. And indeed, so far as the point of substitution is concerned, in respect of product and ma-

terial like the kind here in question, the right to make such substitution by contract, or by methods of doing business in the absence of a contract, is no longer disputed in the well-considered cases. If, as in the case of Blydenstein v. New York Security & Trust Co., supra, the parties might later make it a term or provision of the contract that substitution might be made from time to time in regard to material in bulk or in mass, it follows necessarily that a method of transacting the business in the same way would be valid in the absence of an express contract providing for such method of doing business—certainly so as regards transferees for value.

In reference to cases, I have not regarded it as essential, in view of the close analogy, to point out the distinction between bills of lading, as symbols of property, and warehouse receipts. The former, by mercantile law and usage, stand as substitutes for, and as symbolic representatives of, the goods described, and are, in a general sense, negotiable. The transfer passes the title, though the instruments are not negotiable, in the full sense of the law merchant, in the absence of statute. Warehouse receipts, in like manner, are now regarded as symbols of property, and their transfer passes the title, and by statute of the state of Tennessee they are made negotiable, and it would seem that they are quasi negotiable instruments under the law of Alabama, in the absence of a restrictive indorsement of the instrument. However this may be, it is well settled that the title to the property described passes by the indorsement, in due course of trade, for value, of both classes of instruments; and cases relating to the one class of instruments, so far as the transfer of possession is concerned, are equally applicable to instruments of the other class.

It remains to consider briefly the claim of the Santa Fé Land & Improvement Company. I do not regard it as important to distinguish between the Santa Fé Land & Improvement Company and the Atchison, Topeka & Santa Fé Railway Company, and the separate part performed by each in the transactions which give rise to this claim, and the claim may be referred to generally as that of the Santa Fé Land & Improvement Company.

Now, the car-building contract in question, as originally entered into, was between the Santa Fé Land & Improvement Company and the Standard Steel Car Company. The contract is found in a letter written in answer to invitations for bids on building certain cars according to specifications, and the letter and the acceptance thereof, which completed the contract, are as follows:

"Chicago, Ill., Jan. 28th, 1903.

"Santa Fé Land & Improvement Co., Chicago, Ill.—Gentlemen: We propose to build for you and deliver f. o. b. tracks of the Atchison, Topeka & Santa Fé Railway Company at any junction point, our option, between Chicago and Kansas City, inclusive, 1,200 36-foot box cars of 60,000 pounds capacity at price, and under specifications, terms and conditions as expressed hereafter.

"Price: Eight hundred and nineteen dollars ($819.00) each.

"Specifications to be in accordance with the specifications of the Atchison, Topeka & Santa Fé Railway system No. 126, dated Topeka, Kansas, January 9, 1903, a copy of which is attached to and made part of this agreement. In said specifications it is understood that where yellow pine is specified it means, long leaf yellow pine. Cars to be provided with two name plates, in

suitable location on cars, reading 'This car is the property of the Santa Fé Land Improvement Company.' It is understood that you will furnish the following material on receipt of proper order from us, giving dates of delivery, at the prices and places of delivery named below:

"Air Brake, $30.00 per car f. o. b. Wilmerding.

"Brake Beams, $12.40 per car f. o. b. Detroit.

"Truck Transoms, Bolsters and body bolsters, $142.00 per car f. o. b. East St. Louis.

"Journal Boxes, $18.40 per car f. o. b. Chicago.

"Journal Bearings, $12.65 per car f. o. b. your works.

"Draft Rigging, $20.40 per car f. o. b. your works.

"Springs, shaft and bolster, $14.80 per car f. o. b. your works.

"Couplers Trojan, not including brackets, $18.00 per car f. o. b. your works.

"Roof (Murphy), $25.50 per car f. o. b. your works.

"Total for material furnished $294.15 per car.

"We agree to accept the above material from you and pay to you the prices for same named above.

"Delivery: We guarantee to deliver the above cars during months of July and August, 1903, provided that if we desire, in order to effect delivery of all the cars prior to August 31st, we may commence delivery of the cars prior to the 1st of July; delivery contingent, however, upon strikes, accidents, fires and other causes unavoidable and beyond our control.

"Terms: Cash on arrival of cars on tracks of the Atchison, Topeka & Santa Fé Railway Company, as provided herein in lots of 25, inspector's certificate to be attached to invoice, provided that no payments shall become due and payable prior to the first day of July, 1903, but on that date payments shall be made for such cars as may have been delivered prior to the first day of July, and thereafter as cars are delivered.

"This letter is written in duplicate and your acceptance hereon will constitute a contract between us.

"Standard Steel Car Company,<br>"J. M. Hansen, President."

"Accepted:

"Santa Fé Land Improvement Company,
"By W. B. Jansen, Vice President."

The contention on behalf of defendant banks is that this contract is complete and unambiguous in its terms and provisions, and constitutes a sale, and not a bailment of the car material and specialties set out in specifications referred to, consisting of air brakes, brake beams, journal boxes, and the like, and that it is not permissible for the court to consider what occurred in any previous negotiations or in subsequent dealings with this car material to be furnished by the Santa Fé Land & Improvement Company. In determining whether the contract is one of sale or bailment, the evidence which it is supposed tends to show that the transaction was a bailment, and not a sale, was duly objected to on the hearing upon the ground that the tendency of such evidence is to vary and contradict the written contract as made, and the meaning of which is not doubtful. A previous letter written by the Standard Steel Car Company in relation to the same matter, and dated January 26, 1903, is as follows:

"Standard Steel Car Company.   General Offices Frick Building.
J. M. Hansen, President.

"Pittsburg, Pa., 1612 Fisher Building.

"Mr. W. E. Hodges, Gen. Pur. Agt., A. T. & S. F. Ry. Co., Chicago, Ill.— Dear Sir: In reply to your valued inquiry of the third instant in relation to naming you price on wooden box cars, we take pleasure in quoting you as follows:

"On 3,000 wooden box cars of 60,000 pounds capacity, in accordance with your company's drawings and specifications, delivered f. o. b. your company's tracks, Chicago, Ill., a price of Eight Hundred Twenty-Five Dollars ($825.00) each car, your company to furnish the grain doors free of cost to us at our works.

"Delivery of these cars to begin at our works during April, 1903, at the rate of from 30 to 35 cars per day, until completion of order.

"Should your company decide to furnish f. o. b. cars the material listed below we will make allowance in accordance with the following schedule:—

Point of Delivery.

| Material. | F. O. B. Cars. | Allowances Per Car. |
|---|---|---|
| Player Cast Steel Truck, Bolsters and Transoms | East St. Louis | $100 00 |
| Leighton & Howard Cast Steel Body Bolsters | East St. Louis | 42 00 |
| Miner Draft Attachments | Chicago, Ill | 20 35 |
| Malleable Iron Journal, Boxes and Lids | Butler, Penn. | 16 68 |
| Journal Bearings | Chicago, Ill | 12 86 |
| Bolster & draft springs | Butler. Penn | 14 00 |
| M. C. B. Couplers | Coupler Works | 18 50 |
| Monarch Brake Beams | Detroit, Mich | 11 64 |
| Westinghouse Air Brakes | Wilmerding, Penn | 29 00 |

"Thanking you for your kind inquiry and trusting our proposition will receive your favorable consideration, we beg to remain.

"Yours very truly,        [Signed]      J. M. Hansen,
"President."

It would needlessly incumber this opinion to set out the specifications and the subsequent correspondence between the parties to the contract, and between the Santa Fé Land & Improvement Company and the Southern Car & Foundry Company, the bankrupt; the Standard Steel Car Company having assigned the car building contract to the Southern Car & Foundry Company, at Anniston, Ala., under an arrangement by which that company was to build the cars, instead of the Standard Steel Car Company.

In the auditing departments of the Santa Fé Land & Improvement Company and the Atchison, Topeka & Santa Fé Railway Company, and on their books, the contract was clearly treated as a sale, and the price of the car material and specialties furnished by the Santa Fé Land & Improvement Company through the Atchison, Topeka & Santa Fé Railway Company as a debt against the Standard Steel Car Company, and finally against the Southern Car &. Foundry Company, to be deducted from the price at which the cars were to be manufactured, and credit for the material to be allowed in settlement for the cars as made and delivered from time to time. A regular bill or invoice of these goods, in the usual form, was sent to the Southern Car & Foundry Company, stating how a draft for the price annexed should be sent, but accompanied by a letter which stated that the bill calling for the price would be deducted in the voucher remittance of the Santa Fé Land & Improvement Company, in payment for the cars. When the car material was shipped from the manufacturers to the Southern Car & Foundry Company, a printed form of receipt, or acknowledgment of the arrival of the goods, was sent by the Southern Car & Foundry Company.

It is shown in evidence that it was customary for railways, in making contracts for the construction of cars, to furnish parts of the material necessary to a completion of the cars, but it is not shown in the evidence that a course of dealing like this had previously occurred between these parties; and Hodges, a witness for the Santa Fé Land & Improvement Company, explains that the reason why the Santa Fé Land & Improvement Company furnished the material through its associate, the Atchison, Topeka & Santa Fé Railway Company, was that it could purchase the material at a lower price than the figure at which the same goods were estimated in the contract—the Atchison, Topeka & Santa Fé Railway Company being a large purchaser of such material—and that when, in the car-building contract, the estimate on the cost of the cars was fixed, it was seen that the Santa Fé Land & Improvement Company could make a profit by buying and furnishing such material as it had the right to furnish under the contract. The right to supply this material by the Santa Fé Land & Improvement Company was not because there was any difficulty in the Southern Car & Foundry Company securing these car specialities or material, or that they were to be of any particular design or standard, which the Southern Car & Foundry Company could not secure on the market, but, as explained by the witness Hodges, because a profit could be derived in purchasing this material direct from the manufacturers by the Atchison, Topeka & Santa Fé Railway Company at an advantageous price, and furnishing the material to the Southern Car & Foundry Company at a price above that sum; this price to be deducted from the contract price of the cars when completed and delivered. And in this connection it may be remarked that the Santa Fé Land & Improvement Company was not under obligation by the contract to furnish these car specialities and material, but had the option to do so, provided it availed itself of that option, in order to secure a profit and gain by reason of the difference between the purchase price to it and the credit price which it was allowed against the full contract price of the cars.

It is insisted on behalf of the Santa Fé Land & Improvement Company that the letter of January 26, 1903, tends to show that the transaction was a bailment, and so intended, and not a sale; and likewise in regard to the acknowledgment or receipt forwarded by the Southern Car & Foundry Company when the consignment of this material was received at its plant at Anniston, Ala. It is also said that the circumstance that neither the Santa Fé Land & Improvement Company nor the Atchison, Topeka & Santa Fé Railway Company was a dealer or seller of material and car specialties like those furnished under this contract is material in determining whether, under the contract, there was a sale or bailment of the personal property in question.

On behalf of the defendant banks the point is made that at the time this contract was executed, and, so far as the record discloses, now, the Standard Steel Car Company was entirely solvent, and that neither party ever contemplated, even remotely, any difficulty such as that which has come about on account of the bankruptcy of the Southern Car & Foundry Company, the assignee of the Standard Steel Car Company. It is said there was no motive for making a bailment instead of a sale, but, on the contrary, good reason on the part of the Santa Fé

Land & Improvement Company for furnishing these goods as a sale, instead of a bailment, as the burden of loss by accident would, in that view, be put upon the other party.

Without further reference in detail to the facts, or the discussion of these facts, it is sufficient to say that if it is permissible to look outside of the contract as made by the letter which contained a final proposition by the Standard Steel Car Company, and accepted in due form by the Atchison, Topeka & Santa Fé Railway Company in writing, much may be said on both sides in the way of pointing to minor circumstances as bearing on the question of whether this was a contract of sale or of bailment; and the case would, in these minor circumstances, perhaps, be about evenly balanced. I do not understand eminent counsel for the Santa Fé Land & Improvement Company to insist that the contract was a bailment, if its interpretation must be limited to the letter which contained the final proposition, and the written acceptance of that proposition. However this may be, it seems to me that it is too plainly evident for denial that the letter, as accepted, construed without regard to previous negotiations or subsequent dealings, constitutes a contract of sale, and not of bailment, and that the circumstance that the purchase price was to be paid by deducting from the contract price of the cars is not material, and would not change the result. After careful study of this contract, I have concluded that the contract cannot be affected in its interpretation or enforcement by any facts disclosed in previous negotiations or in the subsequent dealings between the parties, and this view renders it unnecessary to discuss minutely the circumstances both previous and subsequent to the execution of this contract which are supposed to bear upon its interpretation.

I conclude that the written contract contained in the final letter and specifications referred to, and the acceptance, is complete, and is not ambiguous, and that the case is within the principle of Powder Company v. Burkhardt, 97 U. S. 110, 24 L. Ed. 973. I would be entirely willing to announce a different conclusion if I felt that I could justifiably do so on this record, and under the authorities in relation to this question of sale or bailment.

It is hardly necessary to state that, under its cross-bill intervention, the burden is on the Santa Fé Land & Improvement Company to establish the proposition that the contract was a bailment, and not a sale, and that the title to the property did not pass to the bankrupt. Crosby v. Delaware & Hudson Canal Co., 141 N. Y. 589, 36 N. E. 332; In re Leeds Woolen Mills (D. C.) 129 Fed. 922.

As between the Santa Fé Land & Improvement Company and the Southern Car & Foundry Company, bankrupt, this result would militate against our common sense of justice and against equity, but the question here is considered between parties both of whom are entirely innocent in regard to the rights which they are asserting in the case. The Santa Fé Land & Improvement Company placed the property in the possession and under the control of the bankrupt, and clothed the bankrupt with the apparent ownership of the property, without any restriction or limitation in the contract, or otherwise, calculated to protect itself or others dealing with the Southern Car & Foundry Company, as innocent purchasers, from the possibility of just such wrong and hardship

as must now fall upon some one. Placing this particular property in pledge under a warehouse receipt by the Southern Car & Foundry Company could not be regarded as an honorable transaction, as there was clearly an implied confidence and trust in the consignment of this property to the Southern Car & Foundry Company under the contract, and the abuse of that trust and confidence is without any redeeming feature. But the unfortunate situation now is that an injury has been inflicted, and all that remains for the court to do is to determine, as between the Santa Fé Land & Improvement Company and the defendant banks, as holders of the warehouse receipts and of this property in pledge, upon whom this harsh loss must fall. Both parties have acted in good faith, and nothing can be charged against either in that regard. If the testimony as to negotiations previous to the final contract and the methods of dealing with the car material furnished under the contract subsequent to its execution were admitted as competent evidence, and duly considered, it could hardly be regarded as sufficient to change the result. It must be acknowledged that the case is close and doubtful. If, upon the whole of the evidence, the proper interpretation of the contract were still left doubtful, there is authority for the doctrine that this doubt would be resolved against the maker of the contract, in favor of an innocent purchaser. In Arbuckle v. Kirkpatrick, 98 Tenn. 221, 29 S. W. 3, 36 L. R. A. 285, 60 Am. St. Rep. 854, the question was whether or not the contract under consideration was one of sale, or of mere agency; and, in the concluding paragraph of the opinion, Judge Wilkes, giving the opinion of the Supreme Court of the state of Tennessee, said:

"In construing such a contract, whenever it affects the rights of others, it will be so construed as to protect such rights, and not to enable the complainant to carry out any double purpose. In view of its uncertainty and contradictory provisions, the court will see that third persons are not prejudiced by its construction. The decree of the Court of Chancery Appeals is therefore affirmed."

As I conclude that the written contract, as finally entered into, must be regarded as a contract of sale, and not of bailment, and that this interpretation cannot be changed by extrinsic evidence, it is unnecessary to take up the inquiry whether the proposition declared by the Supreme Court of Tennessee is applicable in a contract like this, and as between the Santa Fé Land & Improvement Company and the defendant banks, who are the real parties to this contest over the car specialities property.

In regard to the leading question here between the trustees and the defendant banks, it was said by counsel that while considering the position, as bona fide holders, of the defendant banks, it must not be forgotten that the general contract creditors are also innocent creditors, although not innocent holders as known to the law. The force of this suggestion is acknowledged, but it is also not to be overlooked that the general creditors extended credit upon the general solvency and commercial standing of the bankrupt upon the whole of its credit and property, and not upon any particular property, while the defendant banks extended credit and advanced money distinctly upon the faith of the special property and material called for by these warehouse receipts,

which are made negotiable by a statute of Tennessee, and are everywhere recognized in law and in mercantile usage as symbols of property, and as passing title to the property specially described in such instruments. So that, while both parties are innocent creditors, the one is a general creditor, and the other an assignee for value of special property, and is afforded protection by the law as such, and the position of such assignee for value is different from that of a general creditor. All of this is, of course, obvious enough without restating it.

The views thus expressed will sufficiently indicate the several orders and decrees appropriate to give effect to these views.

The costs which have accrued under the cross-bill intervention of the Santa Fé Land & Improvement Company will be paid by that company, and the remaining costs incident to the bill by the trustees in the case will be paid out of the general fund belonging to the estate of the bankrupt subject to administration and general distribution among the creditors.

NOTE.—The case of Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. ——, just decided, is authority for the view, expressed in the foregoing opinion, that the trustee under the existing bankruptcy act takes the property of the bankrupt in just such condition as the bankrupt himself held the property, in the absence of fraud or some positive provision of the bankruptcy act itself. The court said:

"Under the present bankrupt act, the trustee takes the property of the bankrupt, in cases unaffected by fraud, in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt, except in cases where there has been a conveyance or incumbrance of the property which is void as against the trustee by some positive provision of the act. In re Garcewich, 53 C. C. A. 510, 115 Fed. 87, 89, and cases cited."