PHILADELPHIA WAREHOUSE CO. v. WINCHESTER et al.

(Circuit Court, D. Delaware. September 5, 1907.)

No. 262.

1. PLEDGES—VALIDITY.

    The Philadelphia Warehouse Company, being engaged in the business of advancing cash or giving credit to manufacturing and other establishments on the security of a pledge of merchantable commodities, loaned $150,000 to the Diamond State Steel Company on collateral notes of the latter company, taking from it leases of portions of its premises on which personal property intended as security for such notes and their renewals was situated, and pursuant to contract with the steel company appointed a custodian of the leased premises and of the personal property deposited or thereafter to be deposited thereon; the custodian being an employé of the steel company. The custodian duly took possession of the leased

premises and placed and continuously maintained thereon in a number of conspicuous positions signs and placards plainly indicating that the warehouse company was the owner of or specially interested in the personal property thereon. *Held*, that a valid pledge of such personal property was created in favor of the warehouse company which should be enforced against receivers of the steel company.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Pledges, §§ 34, 35.]

**2 SAME—NOTICE.**

Due and reasonable care should be observed by a pledgee to negative the existence of ostensible ownership in the pledgor, and to this end such means should be resorted to as fairly to inform or put third persons on inquiry; but the common-law doctrine of pledge does not require the adoption of such means of giving notice to the public as absolutely to insure to all persons dealing with the pledgor knowledge of the existence of the pledge, nor should it be so strained as to shock reason and negative in large measure the validity of pledges fairly made for the accomplishment of useful ends in extensive industrial operations.

**3. SAME.**

The signs and placards placed by the warehouse company on the leased premises being of such character as to attract the attention of persons of ordinary intelligence and capable of reading and understanding the English language, and being plainly visible to those visiting the premises and using reasonable care and circumspection, the warehouse company fully discharged its duty to negative ostensible ownership in the steel company.

**4. SAME.**

The fact that the steel company had some of its own unpledged property on the leased premises could not, as against reasonable notice to the public afforded by signs and placards, establish ostensible ownership in that company of the pledged property; for, while it might have a tendency to create belief on the part of third persons that the unpledged property on the leased premises was in fact pledged, the effect of such belief, far from causing false credit to be given to the steel company, would tend to deter third persons from extending to that company credit which otherwise it might receive.

(Syllabus by the Court.)

In Equity.

John Douglass Brown, for complainant.

H. H. Ward and A. C. Gray, for defendants.

BRADFORD, District Judge. The Philadelphia Warehouse Company filed a bill in this court March 1, 1905, against James P. Winchester and Howard T. Wallace, receivers of the Diamond State Steel Company and also the Diamond State Steel Company, alleging that certain personal property of the latter company had been pledged to the complainant to secure the repayment of moneys loaned or advanced or to be loaned or advanced by it to the Diamond State Steel Company, and praying, among other things, as follows:

"3. That defendants pay to complainant the moneys due upon complainant's advances to the Diamond State Steel Company, including principal, interest, costs, charges, commissions, fees and expenses, to which complainant is entitled under its several pledge contracts, leases or other agreements with the Diamond State Steel Company, and thereby redeem the property in complainant's possession, pledged to it by the Diamond State Steel Company; or in default of such payment that complainant be permitted to pursue its remedies under its several pledge contracts or agreements without interference or hindrance on the part of defendants or of any other persons; accounting to the receivers of the Diamond State Steel Company or to such other party or

parties as may be entitled to receive the same, for the surplus of material, or of cash, or of both, remaining in its hands after the liquidation of its claims as aforesaid."

Answer and replication having been put in, the case was at issue April 8, 1905. Subsequently, June 5, 1905, all the parties entered into a stipulation for a surrender by the complainant to the receivers of certain premises leased to the former by the Diamond State Steel Company on which the property alleged by the former to be subject to a lien in its favor by reason of a pledge was situated, and for the sale of such property by the receivers and the deposit and retention of the proceeds of sale, within certain limits and subject to modification by the court as to amount, as a special fund to abide the determination of this case. The stipulation contained the following provision:

"It is understood and agreed that nothing herein contained shall affect or impair the rights of any party hereto and that in surrendering possession of the merchandise covered by this agreement to Messrs. James P. Winchester and Howard T. Wallace as receivers, the Philadelphia Warehouse Company is surrendering the same to be held by the said receivers as under a special trust or appointment and is not, as pledgee of the said merchandise, redelivering it, or surrendering it, to the pledgor thereof, or the legal representatives of the pledgor thereof, and is not surrendering or relinquishing any of the rights secured to it under its general contract, under its several pledge contracts, under its several leases, or under any of the other contracts or agreements or writings which it holds and to which the Diamond State Steel Company is a party."

The court by a decretal order June 10, 1905, approved the above mentioned stipulation, directed it to be filed, and declared:

"That the Philadelphia Warehouse Company is authorized to surrender the leased premises and to deliver the merchandise referred to in the said stipulation; and that James P. Winchester and Howard T. Wallace, receivers of the Diamond State Steel Company are authorized to receive the same, as a special trust, to be administered in accordance with the agreement set forth in the said stipulation; and that the effect of the said stipulation and of this decree confirming the same and of proceedings by any of the parties hereafter taken in accordance with the said stipulation shall not affect or impair the rights of any of the parties to this present cause, but that the proceeds of sales made under the said stipulation shall be held to await the determination of this cause, and the later order of the court."

The property on which a lien was claimed by the complainant has since been sold, the proceeds of sale are within the control and subject to the disposition of the court, the evidence has been taken and returned by the examiner, and the case is ripe for final adjudication. The complainant is a corporation of Pennsylvania and its business is to advance cash or give credit to manufacturing and other establishments on the security of a pledge of merchantable commodities. It has no public warehouse; and when it is impracticable to store the merchandise, intended to be pledged, in such a warehouse and receive warehouse receipts, the complainant is in the habit of securing storage room for such merchandise at the plant or establishment of the borrower, taking and retaining possession of such merchandise by means of a lease of the buildings or premises containing it, placing and retaining in charge thereof a custodian in the employ of the com-

plainant, and marking the leased premises in order that the public may not be misled or deceived, with respect to the property thereon. The warehouse company and the steel company entered into a contract under seal February 13, 1903, in and by which the former agreed to make advances to the latter on the security of merchandise manufactured by the latter and of raw material or other personal property used in the manufacture of the finished product at its plant in Wilmington in this district. The contract, among other things, provided as follows:

"The advances will be made and will be payable at the office of the warehouse company in the city of Philadelphia. The steel company will lease to the warehouse company several buildings, suitable for storage of the commodities upon which the advances are to be made, also portions of the land belonging to the steel company suitable for storage yards for the same purpose. The warehouse company will employ and place in charge of these leased premises a custodian who shall furnish bond in the amount of one hundred thousand ($100,000) dollars, with security satisfactory to the warehouse company, conditioned for the faithful discharge of the duties of his appointment, and he shall at all times maintain exclusive possession of the leased premises, and their contents, for the warehouse company. Contracts of pledge will from time to time be executed as advances are made, but the execution of such contracts shall not abrogate or impair the legal effect of the pledging of the entire contents of the leased premises, or of the entire stock of merchandise or goods delivered to the custodian of the warehouse company, or affect the right of the warehouse company to maintain and uphold its legal possession of all goods on the leased premises by its duly appointed custodian."

Pursuant to this contract and on the same date the steel company executed under seal four leases to the warehouse company for as many portions of the premises occupied by the steel company, and a fifth lease February 20, 1903, for another portion of said premises, each of the leases, aside from the description of the land demised and the conclusion and subject to variations in the amount of storage charges, and the difference in the date of the last lease, being as follows:

"This agreement, made the 13th day of February, 1903, between the Diamond State Steel Company, a corporation existing under the laws of the state of Delaware, of the first part, and the Philadelphia Warehouse Company, a corporation existing under the laws of the commonwealth of Pennsylvania, of the second part, witnesseth:

"Whereas, it has been agreed between the parties hereto that the premises hereinafter described shall be leased by the party of the first part to the party of the second part for storage of property consigned to the party of the second part as security for advances, the said premises being maintained at the expense of the party of the first part: Now, therefore, this agreement witnesseth, that for the term of one year from the date hereof, and for so long thereafter as any property shall remain thereon which has not been released on repayment to the party of the second part of all advances and charges upon the same, the party of the first part, in consideration of the benefits to accrue, and of the yearly rent or sum of one dollar, receipt whereof in advance is hereby acknowledged, hath leased and demised, and by these presents doth lease and demise, unto the party of the second part premises at works of the party of the first part at Wilmington, Delaware, particularly described as follows, viz.: * * * To have and to hold said premises, with the appurtenances, unto the party of the second part; together with the right in the party of the second part to have at all times by their agents, servants, or employees, free ingress and egress to and from the same, through or over any other premises of the party of the first part; and the right to place and maintain such signs or marks thereon, or on the property stored thereon, as may be neces-

sary to indicate the proprietorship of said party of the second part; and the paramount right at all times during the continuance of this lease to employ any facilities of the party of the first part for receiving, handling, weighing, storing, caring for, packing, shipping, or delivering property.

"It is further agreed that:

"1. The party of the first part shall furnish all material and labor and bear all expenses for keeping and maintaining said premises in good order and repair, and for the employment of a custodian by the party of the second part, and for receiving, handling, weighing, storing, caring for, packing, shipping, or delivery, property taken into, or delivered from, said premises, in such manner as the party of the second part shall direct; and in consideration thereof charge for storage by the party of the second part prior to the maturity of advances made on merchandise stored shall be waived, and thereafter shall be ten (10) dollars per day or fraction thereof.

"2. The party of the second part shall not, without consent of the party of the first part, for all or any part of the term hereby granted, sub-let the said premises, or occupy or use the same in any other manner than for storage purposes, and for the transaction of such business as may be connected therewith, or incident thereto.

"3. Should the party of the first part violate any of the terms or conditions of this lease; or in any manner interfere with, or make difficult, the duties of the agents, servants, or employees of the party of the second part; or become insolvent; or should the premises hereby leased become involved in any manner in litigation; or should the party of the first part, or the party of the second part, be ejected or ousted therefrom or proceedings be begun for that purpose; or should the party of the second part at any time deem it necessary for the protection of their interests or of the property stored; then the party of the second part shall have the right to remove all property from the premises herein described to such other place or places as the party of the second part may deem proper or expedient; and in case of any such removal the party of the first part undertakes and agrees to pay to the party of the second part all expenses of such removal, and of storing said property elsewhere, until the property so stored shall be released on repayment to the party of the second part of all advances and charges upon the same.

"4. The party of the first part agrees to execute or cause to be executed any further agreement or agreements that may be necessary to secure the convenient use and enjoyment of the premises hereby leased by the party of the second part."

In conformity with the contract of February 13, 1903, and the leases of the same date, the warehouse company on the same day appointed in writing a custodian of the portions of the premises of the steel company then, and thereafter to be, leased to the former, and of the personal property deposited or stored, or thereafter to be deposited or stored, thereon, the appointment being as follows:

"This agreement, made the 13th day of February, 1903, between the Philadelphia Warehouse Company, a corporation existing under the laws of the commonwealth of Pennsylvania, of the first part, and Frank W. Todd, of Wilmington, Delaware, of the second part, witnesseth:

"The party of the first part hereby constitutes and appoints the party of the second part custodian in charge of their premises at the works of the Diamond State Steel Company, at Wilmington, Delaware, now or hereafter held or which may hereafter be held under lease from the Diamond State Steel Company, and of the property deposited or stored on said premises, or which may hereafter be deposited or stored thereon. The party of the second part shall maintain at all times exclusive possession of said premises, and see that the proprietorship of the party of the first part therein is continuously made known by the maintenance of conspicuous signs thereon or on the property stored thereon, to give notice to parties visiting the premises of the possession thereof of the party of the first part. He shall be responsible for the safe keeping of the property of the party of the first part while on storage on said premises, making delivery thereof only upon presentation of the written order

of an authorized officer of the party of the first part; he shall keep accurate account thereof and of receipts and deliveries thereof, reporting to the party of the first part weekly or oftener if required; under general instructions of the party of the first part he may deliver from time to time to the Diamond State Steel Company for their own use pledged merchandise in excess of the aggregate gross value deemed necessary for the protection of the loans which at the time of such delivery are outstanding. Party of the second part agrees to calculate value of pledged merchandise at schedule valuations to be fixed by the party of the first part. And upon the termination of his employment he shall account for all property which has been placed in his custody and shall deliver the same to his successor as custodian, or to such other person or persons as the party of the first part may direct. The party of the second part shall furnish to the party of the first part bond in the sum of one hundred thousand (100,000) dollars, with sureties satisfactory to the party of the first part, conditioned for the faithful custody and proper delivery of the premises and property committed to his care, and the faithful discharge of the duties assumed by him under this agreement. As compensation for his services the party of the second part shall be paid by the party of the first part twenty five (25) dollars per annum.

"This agreement shall continue in force for one year from its date, and thereafter from year to year unless terminated by the party of the first part, or by the party of the second part on thirty days' notice to the party of the first part; provided, however, that upon the termination of the lease, or leases, of the premises herein described the employment hereunder shall cease.

"In Witness Whereof the parties hereto have subscribed these premises the day and year first above written.

"Philadelphia Warehouse Company,
"By Wm. A. Powell, Secy.
"Frank W. Todd."

The warehouse company having received on or about February 13, 1903, a schedule of the personal property of the steel company situated on the premises leased to the former company on that day, afterwards, February 16, 1903, gave its promissory note at four months for $50,000, to the steel company, and the latter company in consideration thereof at the same time and as part of the transaction entered into a contract which, aside from an enumeration of the property intended to be pledged, was as follows:

"Philadelphia, February 16, 1903.

"Invoice of collateral consigned to the Philadelphia Warehouse Company by the Diamond State Steel Company.

    *    *    *    *    *    *    *    *    *    *    *    *

"Having deposited with, and confided to the management, custody, and charge of, the Philadelphia Warehouse Company the property belonging to us described in the foregoing invoice, and that company having advanced to us upon security of said property their promissory note for fifty thousand dollars, dated February 16, 1903, payable June 16, 1903, receiving five hundred dollars as commission for their responsibility and services as above, and loan of their credit, now, in consideration of said loan, we do hereby promise and agree to and with the said company that we will pay to them, at their office in the city of Philadelphia, at or before the maturity of their said promissory note, fifty thousand dollars together with all charges for storage, insurance, and other necessary expenses on account of the said property.

"And we, the undersigned, do also agree with the said company to the following terms and conditions as part of this contract:

"1. The Philadelphia Warehouse Company shall not be liable for any shortage, loss, or injury of, or to, the property in their custody, resulting from water, fire, theft, decay, leakage, wastage, accident, or any other cause than the gross negligence of the said company or of their agents; nor for any loss from failure to insure it, unless such insurance be specially directed in writing.

"2. It is hereby warranted that title to the property described in the fore-

going invoice is in the undersigned, that the said property is free from liens or claims of third parties, and that the description thereof is accurate as to quantity, quality, kind, and value; and it is hereby agreed that a margin of at least as stipulated above per cent. upon the invoice value thereof shall be maintained, and that, in case the market value thereof shall fall, such margin shall be made good upon demand.

"3. The property pledged hereunder, together with any heretofore or hereafter pledged by the undersigned to the said company, to secure this or any other liability, general or special, shall constitute a general continuing collateral security for all liabilities of the undersigned to the said company, and the said company's right, title, and interest therein, shall be prior to all liens or claims thereon, or on the proceeds thereof. And if any property be consigned or delivered to the said company by the undersigned, either in substitution for property withdrawn or as additional security, such substituted or added collateral shall be subject to all the terms and conditions of this contract, including the maintenance of whatever margin may be stipulated for in case of such property.

"4. Either (a) assertion by legal proceedings in any form, of an adverse claim by any third party to the property described in the foregoing invoice, or to any hereafter consigned or delivered to the said company; or (b) fraud, misrepresentation, or concealment, intentional or unintentional, in the description thereof; or (c) failure for twenty-four hours to comply with a demand to make good the stipulated margin; or (d) failure to pay and discharge whatever may be due at the maturity of this or of any other obligation, or of any extension of any obligation, of the undersigned to the said company; or (e) the undersigned's default in meeting other business obligations, and the beginning of legal proceedings by any creditor or creditors to enforce the same; or (f) transfer of the undersigned's business by voluntary act or by operation of law to an assignee, trustee, or receiver; shall render all the undersigned's obligations to the said company immediately due and payable notwithstanding the time limit in any or all of the instruments evidencing the same may not then be elapsed; and the said company may charge and collect as part of the undersigned's liabilities, in addition to legal interest and their usual commission at the rate of three per cent. per annum, all expenditures of every nature, including attorney's fees, which they may find necessary for the protection of their interests and for the collection of whatever may be due them by the undersigned, and costs of any litigation in which they may become involved.

"5. In case of the maturing of the obligations of the undersigned under any provision of the preceding paragraph, the said company may at any time thereafter, in the discretion of their president or vice-president, sell, or cause to be sold, at the undersigned's expense and risk, any or all property held as collateral security, for liabilities of the undersigned, at public or private sale or sales, for cash or on credit, and without notice to the undersigned; and after deducting five per cent. of the net proceeds as commissions of the said company upon such sale or sales, shall apply the balance to the payment of whatever sum or sums may then be owing by the undersigned to the said company, accounting to the undersigned or to the undersigned's legal representative, for the surplus, if any; and the undersigned will be liable for any deficiency. If the sale of the collateral be a public sale by auction of which due notice has been given, the said company may become the purchaser of the same or of any part thereof, and shall in such case hold what is thus purchased as absolute owner thereof, freed and discharged from any right or equity of redemption of the undersigned, such right or equity being hereby expressly waived and released.

"The Diamond State Steel Co.,
"By H. T. Wallace, President.
"The Diamond State Steel Co.,
"By J. A. McKee, Jr., Treas."

Frank W. Todd having, in conformity with the contract of February 13, 1903, and the leases of that date, been appointed custodian of the leased premises and the personal property thereon, took pos-

session of the same as custodian and placed in a number of conspicuous positions on such premises signs which, while differing somewhat in phraseology plainly indicated that the warehouse company was the owner of or specially interested in the personal property thereon. The same statement is applicable, mutatis mutandis, to the premises leased February 20, 1903, and the personal property thereon. The signs placed on the premises leased February 13, 1903, were affixed to the buildings or warehouses thereon, and read "Special Warehouse, Philadelphia Warehouse Company, Philadelphia, Pennsylvania," or "Special Warehouse, Philadelphia Warehouse Company, Philadelphia, Pennsylvania, Frank W. Todd, Custodian, Wilmington, Delaware." The signs placed on the premises leased February 20, 1903, were about 19 in number, distributed about the leased yard and reading as follows: "Storage Yard, Philadelphia Warehouse Company, Philadelphia, Pennsylvania," or "Storage Yard, Philadelphia Warehouse Company, Philadelphia, Pennsylvania, Frank W. Todd, Custodian, Wilmington, Delaware." Two of the 19 signs on the leased yard in conspicuous positions contained a plan or outline of the leased premises. Subsequently the warehouse company loaned or advanced to the steel company, February 20, 1903, and March 13, 1903, respectively, two other sums of $50,000 each on the same or similar terms and conditions as to security by way of pledge as those contained in the contracts and instruments above referred to.

The contracts and negotiations between the steel company and the warehouse company relating to the personal property, on the proceeds of which the latter company claims a lien for advances, clearly did not operate as a sale nor were they violative of the statute of frauds of Delaware, as contended by counsel for the receivers. And it is equally clear that they did not create a chattel mortgage. It is unnecessary to enlarge on these points. These contracts manifestly contemplated a pledge of the personal property then and thereafter to be placed by the steel company on the leased premises. That a contract of pledge may validly cover and operate upon future as well as present deliveries of personal property and may effectually secure future as well as present advances or loans of money is well settled. To constitute a valid pledge there must be actual, or symbolical or constructive, delivery to the pledgee of the property intended to be pledged. It is true that by agreement on sufficient consideration and without delivery a lien on real or personal property may be created which will be enforceable in equity as between the parties and against volunteers or purchasers with notice. Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865; Booz v. Phila. & Lewes Transp. Co. (C. C.) 124 Fed. 430. But such an agreement is in no sense a pledge. The creation and continuance of a pledge require delivery of possession and retention of possession by the pledgee, or his agent, subject to the qualification that, under certain circumstances not material to be discussed in this connection, a return of possession to the pledgor, for a merely temporary purpose, will not defeat the pledge. It has been urged on the part of the receivers that whatever may have been the rights of the warehouse company as against the steel company with respect to a

lien on the property intended to be pledged, the former company had no lien or preference valid as against the creditors of the steel company, for want of delivery of possession to and retention of possession by the warehouse company; the receivers representing not only the stockholders, but also the creditors of the steel company. The steel company and the warehouse company unquestionably contemplated and in good faith intended that the latter company should have a lien on all personal property then or thereafter to be placed on the leased premises to secure the repayment of advances made by the latter company to the former company, and that such lien should continue to operate as such security, except in so far as portions of the personal property on the leased premises, not deemed necessary by the warehouse company to the sufficiency of the pledge, should by permission of that company be sold or otherwise disposed of by the steel company, and thereby discharged of the lien. Nor can there be any doubt that delivery of the property intended to be pledged was made by the steel company to the warehouse company. With respect to personal property not originally on the leased premises, but subsequently placed thereon by the steel company, no question can arise as to an actual physical delivery to the warehouse company. And it is equally clear that there was, if not an actual physical delivery, what was equally efficacious, by the steel company to the warehouse company with respect to the personal property situate on the leased premises at the time of the contract of pledge. Such personal property, it is true, was not raised from the surface on which it rested and physically delivered to the warehouse company, but what transpired in connection with the contracts of pledge necessarily involved a delivery in legal contemplation and a change of possession as between the two companies. No other conclusion is admissible in the light of what occurred. In the contract of February 13, 1903, it was stipulated that the "Steel Company will lease to the Warehouse Company several buildings, suitable for storage of the commodities upon which the advances are to be made, also portions of the land belonging to the Steel Company suitable for storage yards for the same purpose." It was further stipulated that the "Warehouse Company will employ and place in charge of these leased premises a custodian * * * and he shall at all times maintain exclusive possession of the leased premises, and their contents, for the Warehouse Company." Pursuant to the contract of February 13, 1903, leases were duly executed by the steel company to the warehouse company, the leased premises having personal property situate thereon intended to be pledged. Each of the leases provided, among other things, that the warehouse company should have the "right to place and maintain such signs or marks" on the leased premises "or on the property stored thereon, as may be necessary to indicate the proprietorship" of that company, and that a custodian of the leased premises and personal property thereon should be employed by the warehouse company at the expense of the steel company for and on behalf of the former company. Pursuant to the contract and the leases the warehouse company duly appointed a custodian to "maintain at all times exclusive possession of said premises, and

see that the proprietorship" of the warehouse company was "continuously made known by the maintenance of conspicuous signs thereon, or on the property stored thereon, to give notice to parties visiting the premises of the possession thereof" by the warehouse company; to be responsible for the safe keeping of the personal property while on storage on the demised premises, "making delivery thereof only upon presentation of the written order of an authorized officer" of the warehouse company; and upon the termination of his employment as custodian to account for all property placed in his custody and "deliver the same to his successor as custodian, or to such other person or persons" as the warehouse company should direct. The right to the possession of the leased premises and of the property thereon intended to be pledged having thus been conferred upon the warehouse company, Todd as custodian, appointed by and for it, entered into possession and placed or caused to be placed and maintained signs thereon as before stated. Under these circumstances it is idle to contend that no delivery was made by the steel company to the warehouse company of the property constituting the subject of the pledge. Not only did the former company contract for a pledge and lease the premises on which the personal property was located, but affirmatively participated in the delivery by authorizing the custodian, to be paid by it for the purpose, to take and retain possession thereof. And the warehouse company, having received possession of the property intended to be pledged, retained possession of it, on the leased premises, except such portions as, being unnecessary for securing repayment of the money loaned or advanced, were disposed of pursuant to the contracts of pledge. Of course, with respect to such portions the lien terminated, and no question is presented on this point. But aside from the portions so disposed of, the steel company made no use of the leased premises or the property thereon in the least inconsistent with the existence and maintenance of the pledge as claimed by the warehouse company. There was no commingling of the pledged with unpledged property on the leased premises in such manner as to render the former indistinguishable from the latter. Both companies understood what was pledged and what was unpledged. In fact, all of the property of the steel company, real and personal, having been sold under a decretal order of this court, it does not appear that the receivers of the steel company and the warehouse company have had the slightest difficulty in ascertaining and separating the funds arising from the sale of the pledged and unpledged property. This, therefore, is not a case in which confusion of property operates to defeat a pledge by reason of uncertainty as to the identity of its subject.

The real and only crucial question on this branch of the case relates to the sufficiency of possession by the warehouse company as against third persons. Did the steel company have the ostensible ownership of the pledged property? Was that property so intermingled with or indistinguishable from its own unpledged property as to mislead and prejudice third persons and obtain for the steel company credit to which it was not entitled? It is not charged on the part of the receivers that anyone mistook or confounded the pledged

156 F.—39

property on the leased premises with the unpledged property of the steel company, nor is there any evidence to support such a charge. If reasonable precautions were adopted by the warehouse company to secure third persons from deception or mistake as to what property was pledged and to prevent an extension of credit to the steel company on account of such pledged property, the receivers have no just cause to question the existence of a lien in favor of the warehouse company. The system of "field storage" under which the warehouse company largely, if not wholly, conducts its business, has much to commend it, if care be taken not to mislead the public. It is both convenient and economical. It is promotive of the welfare of manufacturing and commercial industries. It avoids all necessity for unreasonably moving from place to place heavy and bulky material. Sound industrial policy requires that when conducted with reasonable safeguards for the public, it should be encouraged, and not discountenanced. Judge Clark in a carefully considered opinion in Bush v. Export Storage Co. (C. C.) 136 Fed. 918, 927, 933, well says:

"It is not to be disputed that the earlier cases on the subject declare a very strict doctrine in regard to the questions of actual delivery, segregation, and exclusive possession, as necessary conditions in constituting a valid pledge, but a study of more recent cases discloses what is always recognized that the law itself, in order to meet the requirements of commerce and our constantly changing industrial and commercial conditions, is progressive and expansive, and constantly, by slow changes, adapting itself to the changed conditions due to progress, and in this way the earlier and more stringent rules are constantly being liberalized and somewhat relaxed. It is now well established, for example, that, in determining the sufficiency of delivery in a pledge, it is necessary to consider the nature of the property, the surrounding circumstances, and the objects of the pledge, and the reasonable convenience of the pledgor and pledgee, and the apparent demands of larger aggregations of capital and large operations in business. It is settled that there need not in all cases be an actual moving of property, but only such a delivery as the property is reasonably capable of, and as is reasonably suitable under the circumstances. In the case of property of much weight or bulk, moved or transferred with difficulty, a symbolical or constructive delivery has become the rule in almost all cases, instead of an actual delivery; and for much the same reasons the strict necessity of segregation is slowly disappearing and the validity of substitution is very well settled. * * * In regard to such heavy and bulky material as iron and other similar products used in a manufacturing establishment like the one in question, it would seem to be quite unreasonable to require that it should be stored or kept in any particular kind of building or warehouse, such as would be necessary for the storage of grain, meats, and the like. Such a requirement would render a warehousing a stem for such material and articles extremely difficult and expensive. In the absence of statutory regulation, I conclude that leased premises like these in question, sufficiently marked off, by placards, stakes or otherwise, to indicate possession, is valid, in law, as a warehouse lot or storage place, and that such a place is suitable and appropriate to heavy and bulky material of the kind in question, and that the premises were sufficiently marked so far as the issues now to be decided are concerned."

The application of the common-law doctrine of pledge does not necessitate the adoption of such means of giving notice to the public as absolutely to insure to all persons dealing with the pledgor knowledge of the existence of the pledge. Such a stringent requirement would be wholly unreasonable and impracticable. Certainly it is not

the duty of a manufacturing pledgor, as a preliminary step to buying material on credit or receiving loans or advances from persons at a distance, to inform such persons of the existence of a pledge, what property is covered by it, and what amount of money secured by it. It would hardly be more unreasonable to require a pledging corporation to furnish to purchasers or lenders a complete financial statement of its assets, liabilities and business, showing inventories, trial balances, and all other matters relating to its solvency or financial standing. There is a prima facie presumption of fair and honest conduct on the part of men in their business dealings, and upon this presumption necessarily large reliance must be placed in civilized and enlightened communities. Confidence in business is a necessity. Risks of financial loss are incurred, it is true, but the law cannot, however desirable it might be, abolish all such risks in the transactions of society. It cannot afford full protection to the public against all imposition, negative as well as affirmative, on the part of pledgor or pledgee, or save third persons from the injurious consequences of lack of circumspection and inquiry on their own part. Is a man, who knows of the existence of the steel company and sees its extensive plant at a distance of a quarter or half a mile, justified by the law and to be protected against loss in assuming that all of the property on the premises belongs to that company? Or is he to be saved by the law from harm if he assumes that the company is a prosperous concern and worthy of credit, because the real estate and personal property there situate may be worth a million or a couple of million dollars, when in fact its liabilities may be such as to render it insolvent? He should guard himself against risks involved in such assumptions by reasonable inquiry and precaution. But it is unnecessary to multiply such suggestions. The extent to which the doctrine of pledge can go is that the ostensible ownership of the pledged property shall not be in the pledgor. Even this rule is subject to the qualification that pledged property may, without a surrender of the pledge, be delivered by the pledgee to the pledgor for certain special and temporary purposes not necessary to be discussed here. Due and reasonable care should be observed by the pledgee to negative the existence of ostensible ownership in the pledgor, and to this end such means should be resorted to as fairly to inform or put third persons on inquiry. The law does not require more than this. The warehouse company, as before stated, took leases from the steel company of the premises on which the pledged property was situated and appointed a custodian thereof. It is immaterial, under the circumstances of this case, that the custodian was also an official of the steel company. The law does not render an officer or agent of the pledgor and pledgee incompetent to be the custodian of the pledged property, where the parties so agree. Dunn v. Train, 125 Fed. 221, 60 C. C. A. 113; Fidelity Insurance, Trust & S. D. Co. v. Roanoke Iron Co. (C. C.) 81 Fed. 439; Bush v. Export Storage Co. (C. C.) 136 Fed. 918. The application of this proposition to this case is the more apparent in view of the fact that Todd, the custodian, was the assistant treasurer of the steel company, and the character of that office, held by him before and after the execu-

tion of the pledge contracts, did not include the custody of the personal property on the premises. These facts alone, however, might not be sufficient to negative ostensible ownership in the steel company; for a person intending to deal with that company might not and probably would not have known of the existence of the leases, which, in fact, were not recorded, and, aside from the placards and signs, he might not have recognized Todd, even if he knew him, as custodian for the warehouse company. But the warehouse company in placing the signs and placards on the buildings and portions of the premises containing the pledged property did all that could reasonably be expected or required of it to notify the public that it had a claim to or interest in or owned such pledged property. It is true that an illiterate or blind person or a foreigner not understanding the English language would have received no information from these notices. But the law does not test discharge of duty by the warehouse company by such exceptional circumstances. If the signs and placards were of such a character as to attract the attention of persons of ordinary intelligence and capable of reading and understanding the English language, and were properly placed and visible to those using reasonable care and circumspection, such persons visiting the premises were chargeable with knowledge of the notices on the signs and placards. That they were of such a character, and so placed and visible, is clear from the evidence. Indeed, in the brief of argument for the receivers their counsel stated:

"It is further admitted that numerous signs were, at the instance of the Philadelphia Warehouse Company, placed upon various buildings and distributed in prominent places around the yards covered by the leases aforesaid, from the Diamond State Steel Company to said Philadelphia Warehouse Company, and that the notice of any person actually visiting the leased yard or the leased buildings would have very likely been attracted by said signs and by the notices intended to be covered by them."

They were sufficient even if their full import should not be gathered by persons visiting the premises, to put them upon inquiry, and inquiry of the steel company or the warehouse company would have fully informed them; for it is not to be assumed that either company would have perpetrated a fraud upon them. But the counsel for the receivers contend that on the leased premises there was not only the property intended to be pledged to the warehouse company, but also certain property of the steel company not included in the contracts of pledge. Stress is laid upon the fact that it appears from the evidence that, included in such property, were sundry manufacturing appliances, implements, apparatus and conveniences operated and used by the steel company so long as it continued in business. The materiality of this circumstance is not perceived. The fact that the steel company had some of its own unpledged property on the leased premises could not, as against notice to the public afforded by the signs and placards, establish ostensible ownership in that company of the pledged property. It might have a tendency to produce belief on the part of third persons that the unpledged property on the leased premises was in fact pledged. But the effect of such belief far from causing false credit to be given to the steel company would

tend to deter third persons from extending to that company the credit to which it might otherwise have been entitled. They could in nowise be injured by the presence of unpledged property on the leased and placarded premises. The evidence does not disclose any management of or operations on the leased premises inconsistent with the continuance in force of the pledge or with good faith toward the public. The proof is to the contrary. Todd testified to the effect that he was in charge of the leased premises and of the property thereon under the terms of his appointment as custodian, and held such property for the warehouse company, and that such use as was made of the leased premises or any part thereof by employés of the steel company was consistent with the instructions received by him from the warehouse company. There can be no reasonable doubt that the receivers of the steel company recognized, adopted and became bound by the provisions of the pledge contracts. From the time of the original erection by the warehouse company of the signs and placards on the leased premises, such notices remained undisturbed, in their original form and position, and continuously, until June 10, 1905, subject to renewal in some instances. After the appointment of the receivers special watchmen were placed by the warehouse company in charge of the leased premises and their contents, who discharged their duties without protest or molestation on the part of the receivers. After their appointment none of the pledged property was disposed of without the consent and express authority of the warehouse company. That possession by the latter company in pledge of the property on the leased premises continued until after the decretal order of June 10, 1905, appears from the receipt given on that day by the receivers to the warehouse company which, inter alia, contained the following:

"Whereas, under a stipulation in the above cause, confirmed by decree of the court entered the tenth day of June, A. D. 1905, property pledged to the Philadelphia Warehouse Company by the Diamond State Steel Company is agreed to be delivered to Messrs. James P. Winchester and Howard T. Wallace, receivers, under the terms set forth in the stipulation by the said decree confirmed:

Now, therefore, * * * William A. Powell, Secretary of the said Philadelphia Warehouse Company, has made delivery on behalf of the said company, turning over to the undersigned the key to the Bolt and Nut Warehouse and delivering possession of all the other warehouses and of the storage yards, and will forthwith direct the watchmen or care takers of the warehouse company to withdraw from the said premises and deliver peaceable possession thereof to the undersigned."

And it was provided in the decretal order:

"That the Philadelphia Warehouse Company is authorized to surrender the leased premises and deliver the merchandise referred to in the said stipulation; and that James P. Winchester and Howard T. Wallace, receivers of the Diamond State Steel Company are authorized to receive the same as a special trust," etc.

There is no evidence, and it has not been suggested, that the warehouse company until after the above decretal order ever surrendered its pledge except as to such portions of the property as were in excess of the value agreed to be retained.

On the evidence the warehouse company fully discharged its duty to negative ostensible ownership in the steel company. The doctrine of ostensible ownership should not be extended so far as to shock reason or destroy in large measure the validity of pledges fairly made for the accomplishment of useful ends in large industrial operations. If reasonable notice to the public was not given in this case, where can the line be drawn? Of course, if courts are prepared to denounce as illegal the whole system of "field storage" that is decisive. But, if not, what more could have been expected or required to be done by the warehouse company to maintain and preserve its pledge than it did do? That it has a valid pledge to secure the amount due to it from the steel company is clear not only on reason but on the cases, which I shall not undertake to discuss. Among them are: First Nat. Bank v. Pennsylvania Trust Co., 124 Fed. 968, 60 C. C. A. 100; Dunn v. Train, 125 Fed. 221, 60 C. C. A. 113; Bush v. Export Storage Co. (C. C.) 136 Fed. 918; Fidelity Trust Co. v. Roanoke Iron Co. (C. C.) 81 Fed. 439. The cases cited by the receivers in their contention against the existence of the lien claimed are without exception readily distinguishable from that in hand. The lien having been transferred, as before stated, to the fund in court, the remaining question relates to the amount of money secured by it.

It is admitted that of the principal sum of $150,000 advanced by the warehouse company to the steel company, $47,748.16 remains unpaid, and is now due to the former company with interest; and further, that, on the assumption of the validity of the lien claimed by the warehouse company it is entitled to receive $6,000 to cover legal expenses; and further, that, on the same assumption, the item of $596.60 claimed in the statement of the warehouse company is correct. On the same assumption, there is a dispute between counsel as to the amount which should be allowed to the warehouse company for the storage of the pledged material. Under the pledge contracts the warehouse company was to receive $55 for each day's storage. Up to June 10, 1905, when the leased premises with the property thereon were surrendered to the receivers, a period of 306 days, a claim for storage had accrued amounting to $16,830. As a general rule, subject to sundry exceptions in cases of illegality or other special circumstances of avoidance, it is not the province of the court to undo contracts deliberately entered into with full understanding of the parties. But the counsel for the warehouse company, in view of the facts of this case, waiving any assertion of a contractual right to the whole amount of the storage charge, has stated the readiness of that company to receive 50 per cent. thereof as a reasonable and proper charge. By reason of this waiver, the sum of $8,415, without interest, only will be allowed instead of $16,830. The item in the statement of claim of a commission of 5 per cent. on sales of pledged property prior to June 10, 1905, amounting to $1,666.92 is allowed. No question has been raised as to the correctness of the amount of the sales prior to this last named day and it seems clear that under the pledge contracts the warehouse company was entitled to commissions on sales made by it or through the receivers as its agents until, by the stipulation of the parties, the pledge lien was taken

from the property on the leased premises in order to attach to the funds thereafter to arise from a sale of the remainder of the property by the receivers. The item of $111.38 in the statement of the warehouse company for brokerage due L. & R. Wister & Co. on sales is disallowed. On the evidence the item of $1,583.07 claimed by the warehouse company as "interest balance" appears to be correct and is allowed. The same is to be said about the item of $896.84, claimed as "commission balance." The item of $3,771.65, claimed as "selling commission" on sufficient quantity of material to liquidate the balance due the warehouse company is disallowed for the reason that the pledge contracts in connection with the stipulation of June 5, 1905, on which the decretal order of June 10, 1905, was based, are wholly inconsistent with the maintenance of such a claim. The warehouse company is entitled to a decree in its favor for the aggregate amount of the demands hereinabove allowed, together with interest, on such as bear interest, and costs, to be paid out of the fund in court retained to answer the purposes of this suit, and is also entitled to receive out of said fund $5,000, or so much thereof as the warehouse company shall deem necessary, to be retained by said company to abide the determination of the attachment suit in Philadelphia, mentioned in the bill of complaint; the receivers of the steel company to have a right to ask leave to intervene in that suit to secure the dissolution of the attachment, and the warehouse company to account to the receivers for any surplus of the said sum of $5,000 remaining after the attachment has been disposed of. Let a decree for the complainant be prepared in accordance with this opinion and be submitted.